Raymond Alfred **BEAUDINE**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 22802.

United States Court of Appeals
Fifth Circuit.

Nov. 17, 1966.

418

Frank Ragano, Raymond E. LaPorte, Tampa, Fla., for appellant.

Edward Boardman, U. S. Atty., Robert B. McGowan, Asst. U. S. Atty., Tampa, Fla., for appellee.

Before BROWN, GEWIN and GOLD-BERG, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The Appellant, Beaudine, an officer of Clearwater Federal Savings and Loan Association, was convicted for taking kickbacks from a contractor performing work for borrowers under Title I, Home Improvement Loan, in violation of 18 U.S.C.A. § 1006. Beside the attack upon the sufficiency of the evidence which we find unavailing once the standard of "defrauding" is fixed, his complaint is directed primarily to the undue restriction of cross examination of the contractor, an admitted ex-convict, and one who had participated in like ventures before. We conclude that standing alone none of the instances of restrictive cross examination would call for reversal. But when considered together and in the light of other restrictive evidentiary rulings, we are left with such uncertainty that we cannot pass them off as harmless error. We therefore reverse and remand for new trial.

The story may be quickly told. Beaudine shortly after coming with Clearwater [1] was promoted to Assistant Vice President and put in charge of Title I, Home Improvement Loans. Under the regulations, 24 C.F.R. § 201.6f, the lending association was afforded wide latitude in relying on the application for loan executed by the prospective borrower. Beaudine, however, establishing standards for Clearwater required a credit inquiry and report from the local Credit Bureau. Occasionally the Credit Bureau report would reflect outstanding debts of the applicant, frequently small in amount but old in age, such as doctors, hospital bills, etc., which would adversely affect the current credit rating of such person. Under the arrangement with Mulvey, the contractor, Beaudine would advise Mulvey of such situations. Mulvey was to advance the funds through the Credit Bureau acting as a collecting agency to pay off such adverse items. Mulvey would then "sell" the loan applicant on giving the improvement contract to his company. For this Mulvey agreed to split the contracting profits on each of such jobs on a 50/50 basis with Beaudine. In the period of three to six months there were approximately 70 such contracts which netted approximately $12,000 to $16,000 to Beaudine. All of the payments by Mulvey or his representatives to Beaudine were in cash and delivered furtively in a clandestine manner.

It rounds out this brief picture to state that the Government did not prove, nor even undertake to prove, that Clearwater suffered any loss or likely would suffer a loss from any of the Beaudine-Mulvey transactions. Indeed, to the contrary, the evidence showed that Beaudine had rejected not less than 90 credit applications presumably because of intrinsic deficiencies so these never got into the Beaudine-Mulvey profit-sharing arrangement.

The statute, an amalgam by the 1948 Code revisers of 11 or more similar acts respecting a like number of executive departments or governmental agencies, makes it an offense for an officer, agent, or employee of any savings and loan association to participate or share in or receive directly or indirectly any money, profit, property or benefits through any transaction, loan, commission, contract, or any other act of such association if done "with intent to defraud the United States or any agency thereof." 18 U.S.C.A. § 1006.[2] See United States v. Meyer, 5 Cir., 1959, 266 F.2d 747, 755, cert.

1. Clearwater Federal Savings and Loan Association.

2. "Whoever, being an officer, agent, or employee of or connected in any capacity with * * * any lending, mortgage, insurance, credit or savings and loan cor-

poration or association authorized or acting under the laws of the United States * * * with intent to defraud the United States or any agency thereof, or any corporation, institution, or association referred to in this section, participates or

denied, Kennedy v. United States, 361 U.S. 875, 80 S.Ct. 138, 4 L.Ed.2d 113.

■■ If loss to the Association (or the Government) is required or for that matter the purpose to bring about a loss to the Association (or the Government), then this record is inadequate to make out an offense and the motion for a judgment of acquittal ought to have been granted. We agree, however, with the Government that the statute, awkwardly expressed as perhaps it is, is to be given no such narrow reading. Indeed, that it is a composite to cover many agencies and many activities is paralleled by the breadth of the specific actions prohibited which reveal clearly a congressional purpose to keep that part of the market place in which the Federal Government plays such a significant role free from fraud, deception, and corruption. Thus it prohibits actions by officers and employees which, "with intent to defraud," will "deceive any officer, auditor, examiner or agent," and forbids the making of "any false entry in any book, report or statement * * *" or without proper authorization the drawing of "any order or bill of exchange" or the issuance of "* * * any note, debenture, bond or other obligation * * *." 18 U.S.C.A. § 1006.

■■ The statute is intended to do much more than forbid unsophisticated embezzlement, larceny or theft. And that part of the statute with which we are concerned is a typical conflict of interests prohibition. As such it is a congressional recognition of the principle so well grounded in morality and equity that the servant cannot serve two masters and that when this is done without complete disclosure, the law considers that the master-principal's interests either will, or are apt to, suffer.[3] Approached in this light, the charge given by the trial Court, adapted from Judge Mathes' Manual of Jury Instructions, seems quite in order.[4]

■ The fraud commences with the deceit—ostensibly acting solely for the interest of the principal while all the while the faithless servant knows he, too, has a pecuniary interest which will or might subvert his undivided loyalty. When there is the purpose to deceive, it matters not whether the objective is to obtain an advantage or to cause the principal to suffer a loss. Either in effect completed the fraudulent purpose. See also Baiocchi v. United States, 5 Cir., 1964, 333 F.2d 32, 35–36; United States v. Corbett, 1909, 215 U.S. 233, 244–245, 30 S.Ct. 81, 54 L.Ed. 173; cf. United States v. Spector, 7 Cir., 1963, 326 F.2d 345, 349; United States v. Meyer, 5 Cir., 1959, 266 F.2d 747, 754–755; Gevinson v. United States, 5 Cir., 1966, 358 F.2d 761.

■■ Here, of course, once Mulvey's story was credited, Beaudine (a) practiced deceit and (b) stood to, and did, gain extensively. Under that standard, the evidence was therefore sufficient to sustain conviction. But the whole case, both from the standpoint of its legal sufficiency and from the probative persuasiveness for jury resolution, rested on Mulvey. He was a confessed three or

shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such corporation * * * or association, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

3. See Nye v. Lovelace, 5 Cir., 1956, 228 F. 2d 599, at 603 and cases cited note 6. See especially Restatement of Agency § 381, comment (a), (d); § 387, comment (b).

4. "You will note that the acts charged in the indictment-information are alleged to have been done with 'intent to defraud.' However the evidence need not show that the United States or anyone was actually defrauded, but only that the accused acted with the 'intent to defraud'.

"To act with 'intent to defraud' means to act knowingly and with the specific intent to deceive or cheat, for the purpose of either causing some financial loss to another, or bringing about some financial gain to one's self." Mathes, Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 90, § 7.05.

four-time convicted felon. His credibility both from the standpoint of moral trustworthiness and recollection was therefore of critical, decisive importance. But at least twice, under objections made by Government counsel so frequently throughout the whole record as to almost defy the orderly development of any particular fact or thread, the trial Court severely restricted cross examination. After Mulvey had earlier testified in cross examination that he had been convicted "three or four times" for felonies, the last of which was "for fraud against the FHA" in 1960 in that very Court, Government counsel again ob.ected to further inquiry on a ground which turns out to have been a misapprehension of the law.[5] The Court agreed.[6] Again, at the very close of cross examination, counsel's efforts to find out what crimes Mulvey had been convicted of, when and where, were similarly rebuffed by Government counsel's objections sustained by the Court.[7]

▮ We have no doubt that to cut off inquiry in this fashion was erroneous. The one attacking credibility was entitled, at least in the first instance, to establish the number of convictions, the nature of each of the crimes charged, the date and time of conviction. Refusal to allow this minimum information to be developed could not be sustained by the accepted and salutary principle which prohibits the attacker going into the details of the crimes.[8] Moreover, the subject of inquiry being relevant, the purpose of the proposed questioning was something more than merely to establish the fact that he had some prior felony convictions. Here it took the form of a classic inquiry designed to test memory which, in many, many details, was hazy at best. Added to that is the fact that the law does not limit inquiry to whether there was a "felony" conviction. The nature of the crime is a relevant fact for the reason, if no other, that it is rightfully assumed that some types of crimes have a more immediate direct bearing than others on the element of veracity.[9] Of course proof of this vital fact can hardly be made if the inquiry is cut off

5. Government counsel: "I object, * * *. The man [Mulvey] has stated that he has been convicted of a felony three or four times, and that is as far as we can go."

6. The Court: "I think that is as far as * * *

"I don't think the nature of the case involved has anything to do with it * * *. So I don't think the jury should pay any attention to that. What he is entitled to ask is the fact that the man has been convicted of a crime. We are not trying him for the cime."

7. "Q. Now, you stated that you were convicted three or four times. You are not certain of how many times you have been convicted of a felony?
"A. No, sir. Some of them are back forty years ago when I was in my teens.
"Q. And when was the last time you were convicted?
Government Counsel: "He has been over that, Judge.
The Court: "That is not necessary. Now you have got all that you are going to get on that. Going into those offenses is not necessary and we will have no more of this. The question of how many times

he has been convicted of a crime has been gone into thoroughly."

8. "How far may the cross-examiner go in his inquiries about convictions? He may ask about the name of the crime committed, as murder or embezzlement, and the punishment awarded * * *. On the whole, however, the more reasonable practice, minimizing prejudice and distraction from the issues, is the one generally prevailing that beyond the name of the crime, the time and place of conviction, and the punishment, further details such as the name of the victim and the aggravating circumstances may not be inquired into." McCormick, Evidence § 43, at 92–93 (1954).

9. Indeed, see the Model Code of Evidence which would limit the use of felony convictions.
"Rule 106. Evidence Affecting Credibility.
"(1) [F]or the purpose of impairing or supporting the credibility of a witness, any party including the party calling him may examine him and introduce extrinsic evidence concerning any conduct by him and any other matter relevant upon the issue of his credibility as

when the witness admits three or four felony convictions.

Beaudine complains also of restrictive cross examination into the incident of Mulvey's request of Beaudine's counsel that he be paid $500 and following the failure to do so, Mulvey's refusal to give a statement. Apparently at the time of an earlier trial of Beaudine on other charges a couple of years before, Mulvey had been transferred from the Federal Penitentiary to the Tampa City Jail to be available as a witness. About this time Mulvey along with Beaudine had been indicted on May 10, 1963, under the instant indictment for the Clearwater kickbacks. According to Mulvey, he arranged through his counsel to have an associate of Beaudine's counsel (Gonzalez) see him (Mulvey) in the jail.[10] According to Mulvey, he asked if Beaudine would pay his attorney's fees. In a few days associate counsel Gonzalez asked Mulvey where the money was to be sent. In the meantime Mulvey's counsel successfully urged a plea of double jeopardy to the present indictment after which he was returned to the Atlanta Penitentiary. Subsequently, as Mulvey puts it, "When I got out," presumably from the Penitentiary, he found "the $500 had not been paid." Making inquiry of Gonzalez, Gonzalez informed Mulvey that he was no longer associated with Beaudine's counsel and could take no action. Whereupon Mulvey went to Mr. Ragano, one of Beaudine's present counsel who disclaimed knowledge about the agreement to pay $500. At the same time Ragano asked Mulvey if he would care to make a statement and Mulvey declined.[11]

To counsel's question to Mulvey that "You requested 500 and it was not paid; is that right?", Government counsel again interposed an objection that "I think that is in the evidence now." As though cross examination was satisfied with the first answer, the Court responded, "That is all right. Don't spend any more time on this." And then the Judge, not allowing further inquiry, unavoidably, although obviously not intentionally, bolstered Mulvey's credibility by stating, "That is the right answer, isn't it Mr. Mulvey?" to which the witness replied, "Yes, sir." Making one more pass at the subject, counsel's inquiry within the next few moments concerning the $500 met with another objection that "This is just cumulative" and a like admonition from the Judge that "we are not going to spend much more time on it."

▮ Obviously this incident was of vital importance in assaying the credibility of Mulvey. If, as his self-generated narration reflected, it was simply the case of his asking for $500 for counsel fees since his predicament had been brought about by his loyalty to Beaudine and an unconnected unwillingness to give

---

a witness * * * except that extrinsic evidence shall be inadmissible * * *

"(b) of his conviction of crime not involving dishonesty or false statement * * *."

Model Code of Evidence rule 106 (1942). This is in conformity with the Uniform Rules of Evidence, Rule 21. See McCormick, Evidence § 43, at 91 n. 12 (1954). See generally Morgan, Basic Problems of Evidence 74 (1962).

10. There is a strong suggestion that the May 10, 1963, indictment against Mulvey was an outgrowth of his refusal to testify against Beaudine in the earlier 1963 trial. Whether this was from loyalty to Beaudine, fear of self-incrimination, or both was not explored.

11. In the preliminary questioning leading up to the conversation and demand, Mulvey, obviously an experienced witness, fenced with counsel and turning to the court asked if he could tell the story just "like it was." His narrative ended this way:

"So I went to another attorney, and they got me a meeting with Mr. Ragano. [Beaudine's counsel] and Mr. Ragano says, 'I don't know nothing about the 500.' He says, 'Would you care to make a statement for me?' And I said, 'No, sir, I don't care to make no statement.' And that was the end of the conversation on the 500. And that there is the whole deal of the 500."

a statement, it was one thing. On the other hand, if, as the incident certainly at least suggested, it was a case of Mulvey being willing to talk for a price, the price being $500, and an unwillingness to testify on refusal to pay, it was quite a different thing. Of course as every experienced trial lawyer knows, it would have been a TV courtroom drama dream to expect Mulvey to confess in so many words that it was the latter. This could only be demonstrated to the satisfaction of the jury by an adroit, penetrating, relentless cross examination searching deeply into the motivation of this man. Of course as it is almost always the case when cross examination directed to its main objective—destruction of credibility—is unduly restricted, the record, of necessity, does not, cannot, reflect what would have been developed. But in the light of Mulvey's record, the restrictive examination into his criminal past, and at least two other incidents which we shall briefly discuss, it was essential in the truth finding function of the trial that Mulvey's motivations be explored fully and with vigor.

Two other incidents bear on this, one directly, the other at least as a matter of setting each of which was the subject of a restrictive evidentiary ruling and a proper objection by counsel although not asserted separately as error before us.

As a part of the incident described above on inquiry into Mulvey's prior felony convictions, counsel undertook to cross examine him about the conviction for fraud against the FHA in that very courtroom in 1960. The Government objected. Counsel explained that he wished to establish that this conviction was against another bank in the St. Petersburg, Florida area. The close relationship of this so-called prior conviction and the case on trial was soon established. Nevertheless, the Court in response to the Government's objection that it was "highly irrelevant and immaterial" ruled that "the nature of the case involved has nothing to do with" the one on trial.

That was, of course, on the face of things a correct ruling as a matter of legal principle. The details of the prior crime are not to be gone into. (See note 8, supra.) But this was not the situation. This record affirmatively reflects the close connection between the prior case, Mulvey's participation in it, the case on trial, and possible motives for Mulvey's testimony against Beaudine in it. On being indicted on May 10, 1963, along with Beaudine—presumably because he had declined to testify against Beaudine in the earlier case—Mulvey filed a plea of double jeopardy. The hearing revealed that in the prior case involving apparently similar Home Improvement Loan activities with the Florida National Bank of St. Petersburg (Docket No. 7821–T–Cr.), Judge Young at the time of sentencing on June 27, 1961, was fully informed that Mulvey had cooperated fully with the Government representatives in the investigation of the case involving Beaudine and Clearwater as to which no indictments had yet been returned but were apparently imminent. By extensive colloquy between Court and counsel, both Government and defense, Mulvey's assistance in the yet unindicted Clearwater case was brought sharply to Judge Young's attention. Indeed, there was complete agreement between Government and defense counsel that the Judge was to take this into account in sentencing him as to the Florida National Bank cases. As a result of the plea of double jeopardy, Judge Young again considered the June 27, 1961, sentencing proceeding and concluded that since Mulvey's sentence affirmatively took into account both his activities in the Clearwater case and the assistance he had given the Government in its investigation, he had in effect been punished for those acts and the plea of double jeopardy was sustained.

If—and there is no longer any if—the trial Court concluded that the cases were so closely intertwined as to raise the bar of double jeopardy, this was no longer merely the situation of inquiring

424

into the details or nature of a prior felony conviction. The record before the trial Court, but only sketchily before the jury, revealed several things about Mulvey. In 1961, pleading that he had turned state's evidence to help make a case against his accomplice Beaudine, he asked for and presumably received some consideration in the sentence. Next, when he was indicted following his refusal to testify against Beaudine in 1963, he sought the payment of $500 for his attorney's fees and, with or without some connection, declined to give a statement to Beaudine's counsel. Here were interacting factors bearing upon Mulvey's motivation. Was he testifying out of response to some 1961 expectation of leniency from plea of guilty and collaboration? Was he trying to "sell" his testimony for the $500 ostensibly to be paid to reimburse him for counsel fees? Was he testifying against Beaudine because either loyalty to Beaudine or self-incrimination fears led him to decline to testify in 1963 which, in turn, resulted in him being indicted again?

The upshot of it was that Mulvey was fair game for pressing vigorous cross examination in which all of these relevant factors would be subject to penetrating scrutiny. And yet this record reveals that at the instance of the Government this sort of inquiry was nipped in the bud. Neither of the two incidents expressly complained of here would alone justify reversal. But considered together and especially in the light of the other facts revealed we are led to two conclusions. The first is that as the key witness upon which the Government's whole case rested, both legally and persuasively, Mulvey was not exposed to the truth-revealing pressures of the sort of cross examination which is really the heart of our adversary system.[12] Second, this having occurred, we have no way of ruling out the likely harmful consequences. On a matter so important as Mulvey's trustworthiness and credibility, if we are left in doubt we cannot allow the conviction to stand. Kotteakos v. United States, 1946, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557.

Another incident, although not so direct, bears on this general problem of harmfulness. The Government offered in evidence the papers concerning approximately 24 home loan transactions in which Mulvey claimed he and Beaudine had an interest. We quickly agree with the Government that, contrary to Beaudine's attack, this was perfectly proper. With a conspiracy count, the Government was not limited to either the loan transactions which formed the basis of the substantive counts or comprised the overt acts in the conspiracy count. These were properly admissible to prove the general arrangement and relationship between Mulvey and Beaudine, Beaudine's practice on behalf of Clearwater and for himself and the manner in which loans were processed. The obvious purpose was to show Beaudine's close connection, the indispensability of his approval of each of them, and the fact that he did approve these knowing that he would share in the booty. However, through an officer of Clearwater, counsel for Beaudine had approximately 90 other files identified in which Beaudine had rejected the loan applications. Subsequently counsel undertook in cross examining Mulvey to prove from Clearwater's records that 90 some applications had been "rejected." Mulvey stated that he could "tell why they were rejected" but again as a result of Government objections, the Court "sustained the objection" and admonished counsel to "go ahead with something that we can get on here" and to "Let's put an end to this 'rejected' business * * * let's not waste any more time."

In many respects this was, or at least might have been, the very heart of the

---

12. Montgomery v. United States, 5 Cir., 1953, 203 F.2d 887, 890–891; District of Columbia v. Clawans, 1937, 300 U.S. 617, 630–632, 57 S.Ct. 660, 81 L.Ed. 843; Alford v. United States, 1931, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624; United States v. Augustine, 3 Cir., 1951, 189 F.2d 587, 590–591; United States v. Fontana, 3 Cir., 1956, 231 F.2d 807, 810–812.

case. Probably the big issue was the presence or absence of the intention to defraud. The defense theory was that Beaudine took extraordinary care for the interests of Clearwater, established procedures in excess of those demanded by federal regulations, and so successful was he that the bank never, so far as this record reveals, suffered a dime's loss. Since this issue "of intent to defraud" was inescapably for the jury even under the broad and liberal standard which we have laid down, anything which bore upon the purpose, motivation and intention of Beaudine was certainly relevant. It is no answer to suggest, as the inarticulate objection of the Government seemed to imply, that this would be trying each of the 92 "rejections." It was no more doing that than was the Government's affirmative offer of the 24 loan files a "trial" of each of them. This bore directly upon the procedure established by Clearwater, largely through Beaudine, the performance of his own official duties and whether, on the standard we have elaborated, this was done with a deceitful purpose to bring about a loss or obtain an advantage.

We think this illustrates again that the real difficulty in the trial of this case was the Government's insistence that the case could be truncated as the Government saw fit into those transactions which it thought were pertinent. But both affirmatively and defensively, the case was not confined to the three isolated loans forming the subject of the substantive counts or the few items described as overt acts in the conspiracy count. Broad range was rightfully allowed to the Government in establishing the general scheme, pattern, procedure, motivation and practice out of which to establish the requisite intent to defraud and participation in profits. Equally so, broad range was to be afforded in the rebuttal of these ofttimes elusive factors.[13]

Considered cumulatively, these restrictive rulings leave us with the impression that the jury did not see the whole case. Accordingly, the case must be retried.

Reversed and remanded.

13. There were two mechanical problems which seemed to vex the trial of this case. The first was apparently an absence of any pretrial procedure, see Judicial Conference of the United States, Recommended Procedures for the Trial of Protracted Cases 47 (West 1960) and especially page 48 n. 55, now covered specifically by F.R.Crim.P. 17.1 (added February 28, 1966, effective July 1, 1966), by which the mass of documentary evidence was organized, marked, identified, etc. in advance of trial. Throughout counsel for defense stipulated to authenticity, genuineness of initials and signatures, but as this came during the trial each paper had to be separately handled, sometimes three and four times in laboriously undertaking to see whether it had, for example, a signature or initial on it, or the like. The next, and to us more serious, is the procedure, apparently a time-honored one among Florida lawyers and Judges, by which documents can be identified only on cross examination reserving to the cross examiner's own "case" the opportunity to reveal either the contents of the identified paper or offer it in evidence. Considering the valuable right of a defendant to stand on the motion for judgment of acquittal, F.R.

Crim.P. 29; Jackson v. United States, 5 Cir., 1958, 250 F.2d 897, 901, and the hazard that comes to one who undertakes to put on a case after the motion is denied, it is difficult to see how evidence (documentary or oral) which is relevant is to be kept from the jury's consideration until the Government's case is all over and the defendant is forced to put on a case. Where in a civil case a similar action prejudiced substantive rights, we disapproved such practice. Delta Engineering Corp. v. Scott, 5 Cir., 1963, 322 F.2d 11 at 19, on rehearing, 325 F.2d 432. As this sometimes directly involves, or is akin to, the much mooted problem of the Federal versus the Orthodox rule on the scope of cross examination, see Wigmore, Evidence §§ 1885–88, 1890 (3d ed. 1940), we would emphasize that our criticism assumes that the matter sought to be inquired into (by documents or orally) is related to the matters elicited on direct examination in chief (see, e. g., Wigmore, supra, § 1891 (2)) or, if not, that it is a matter going to credibility (Ibid.). Florida certainly accords much liberality in this direction. See Padgett v. State, Fla., 1912, 64 Fla. 389, 59 So. 946; Frost v. State, Fla. App., 1958, 104 So.2d 77.