UNITED STATES of America

v.

George J. HYKEL et al.

No. 71-2091.

United States Court of Appeals,
Third Circuit.

Argued March 23, 1972.

Decided May 23, 1972.

F. Emmett Fitzpatrick, Jr., Fitzpatrick & Smith, Philadelphia, Pa., for appellant.

C. Oliver Burt, III, Asst. U. S. Atty., Louis C. Bechtle, U. S. Atty., Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, and ADAMS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

HUNTER, Circuit Judge.

Appellant George J. Hykel was convicted for violating 18 U.S.C. § 1006, which forbids, *inter alia,* officers of federally-insured savings and loan associations from participating "directly or indirectly" in any loan by the savings and loan association, with intent to defraud.[1] It is argued on this appeal that the evidence was insufficient to support the conviction, and that certain of the District Court's evidentiary rulings require a new trial. We find these arguments without merit, and accordingly affirm.

## I. SUFFICIENCY OF THE EVIDENCE

18 U.S.C. § 1006 provides, in relevant part:

> "Whoever, being an officer . . . of . . . any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation . . . with intent to defraud the United States or any agency thereof, or any corporation, institution, or association referred to in this section, participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such corporation, institution, or association, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Thus three elements must be established to secure a conviction under that section: (1) the defendant must be shown to have the requisite connection with one of the institutions covered by the section; (2) there must be the required participation or sharing in the benefits of a transaction with the institution; and (3) there must be the required intent to defraud.

In determining whether the evidence produced at trial was sufficient to sustain the appellant's conviction, "we are required to review the evidence, together with all inferences reasonably and logically deducible therefrom, in the light most favorable to the government." United States v. Sams, 340 F.2d 1014, 1016 (3d Cir.), cert. denied, 380 U.S. 974, 85 S.Ct. 1336, 14 L.Ed.2d 270 (1965); accord, United States v. DeCavalcante, 440 F.2d 1264, 1273 (3d Cir. 1971); United States v. Hamilton, 457 F.2d 95 (3d Cir., 1972).

The appellant was admittedly the president of the Havertown Savings and Loan Association ("Havertown"), the deposits of which were insured by the Federal Savings and Loan Insurance Corporation, in June, 1965. At that time Thomas and Ella Lawson came to him to seek a mortgage loan for property that they wanted to purchase. A proper application was made by the Lawsons, and eventually the loan was made in the amount of $24,800.

During the course of the arrangements to buy the property, the appellant suggested to the Lawsons that the property would be well suited for construction of apartments. Accordingly, the appellant and the Lawsons entered into an agreement to develop the property. The contract was evidenced by a written agreement drawn by Thomas W. Maher, an attorney who also represented Havertown. The agreement was signed late in June, 1965, according to the Lawsons.[2]

---

1. Another count of the indictment charged appellant with conspiring with others to obtain an FHA-insured loan by means of false statements, but on that count the appellant was found not guilty.

2. N.T. 1–21, 2–105. The written agreement was undated at the time it was signed, and the copy of the agreement kept by the Lawsons was never dated. (G–2). On two other copies of the agree-

Under the agreement, the Lawsons were to proceed with their purchase of the property, apply for a building permit, and execute and deliver all instruments necessary to carry out the agreement. The appellant was responsible for obtaining necessary financing for the project, and was to pay the engineering, architectural, and legal fees, as well as for the costs of obtaining the building permit and zoning changes. Only after these conditions had been fulfilled would the appellant have any interest in the property.

Pursuant to the agreement the Lawsons went ahead with their purchase of the property. A formal contract to purchase was signed on July 10, 1965, and settlement occurred on September 10, 1965. The appellant was present at the settlement, receiving at that time $800 as reimbursement for architect's fees and zoning costs paid by him, $19.75 as a broker's commission for placing the title insurance, and $190 for fire insurance. (N.T. 2–61 to –62).

Thereafter Landon Courts, Inc., was formed. By deed dated April 28, 1967, and recorded March 12, 1968, the Lawsons conveyed the property to the corporation. Stock certificates of the corporation, dated May 15, 1967, were introduced. Of the three hundred shares outstanding, 147 were issued to Mr. Lawson, 147 were issued in the name of Thomas W. Maher, and six were issued in the name of John G. Siegle. Evidence in form of admissions by the appellant was introduced to show that the shares held by Maher and Siegle were held by them for the appellant. (N.T. 2–3 to –4, 2–47 to –48, 2–87).

The building permit was approved on February 28, 1968, and thereafter construction began. A few days before that date, however, the Lawsons' mortgage loan from Havertown had been repaid in full.[3]

The appellant's argument, briefly stated, is that since he had no legal interest in the property until after the mortgage loan had been repaid, he did not "participate" or "share" in the mortgage loan within the proscription of 18 U.S.C. § 1006. We cannot accept this contention.

We agree with the court in Beaudine v. United States, 368 F.2d 417 (5th Cir. 1966), that this part of 18 U.S.C. § 1006:

"is intended to do much more than forbid unsophisticated embezzlement, larceny or theft. And that part of the statute with which we are concerned is a typical conflict of interests prohibition. As such it is a congressional recognition of the principle so well grounded in morality and equity that the servant cannot serve two masters and that when this is done without complete disclosure, the law considers that the master-principal's interests either will, or are apt to, suffer." 368 F.2d at 420.

Even if we accept the facts alleged by the appellant,[4] we are left with the fact that Havertown made a mortgage loan to appellant's partners or coventurers to enable them to purchase property upon which the venture de-

---

ment retained by the appellant, the date September 10, 1965, was written by hand into the appropriate blank spaces in the typed contract. (G–18, G–19).

3. Appellant's brief states that the mortgage loan was repaid on February 21, 1968. Although that date does not appear in the record, it is consistent with the appellant's testimony at trial. In that testimony appellant was unsure of the exact date that the loan was repaid, but was sure that it was repaid just prior to issuance of the building permit. (N.T. 4–113).

4. The Lawsons' deed conveying the property to Landon Courts, Inc., was dated April 28, 1967, although it was not recorded until March 12, 1968. The appellant's contention that delivery of the deed did not occur until the latter date, or at least until after repayment of the mortgage loan. Mrs. Lawson testified to the contrary, however, that the property had been conveyed to the corporation in return for the 147 shares issued to her husband by stock certificates dated May 15, 1967. (N.T. 1–32 to –33).

pended. That the appellant thereby "participated" or "shared" in the benefits of the loan is too obvious to warrant further elaboration.

Appellant also contends that the evidence is not sufficient to show the necessary intent to defraud. We likewise find this contention to be without merit.

■ The fact that Havertown and the United States may have suffered no loss through the transaction does not preclude a finding of intent to defraud. United States v. Weaver, 360 F.2d 903 (7th Cir.), cert. denied, 385 U.S. 825, 87 S.Ct. 57, 17 L.Ed.2d 61 (1966); Beaudine v. United States, *supra*. In the latter case the court stated:

"The fraud commences with the deceit—ostensibly acting solely for the interest of the principal while all the while the faithless servant knows he, too, has a pecuniary interest which will or might subvert his undivided loyalty. When there is the purpose to deceive, it matters not whether the objective is to obtain an advantage or to cause the principal to suffer a loss. Either in effect completed the fraudulent purpose." 368 F.2d at 420.

■ There was ample evidence here that the appellant did not disclose to Havertown's Board of Directors his interest in the mortgage loan to the Lawsons, and in fact took steps to conceal that interest.

Minutes of a special meeting of Havertown's Board of Directors that supposedly took place on September 8, 1965,[5] were introduced. Those minutes contained a full disclosure of the appellant's agreement with the Lawsons. Stephen M. Bennett, a retired Pennsylvania bank examiner, testified that in his examination of the Havertown Board of Directors' minutes in May 1966, he found no minutes for any meeting of the Board on September 8, 1965. (N.T. 3–38). Earl Williams, a questioned-document examiner for the FBI, testified that after an extensive examination of the minutes of the special meeting he had concluded that those minutes were typed on different paper and had been stored in a different manner from the rest of the minutes. (N.T. 3–49 to –61). From this testimony the jury might have found that there had been no such special meeting on September 8, 1965, and that the minutes had been drafted at some later date and inserted into the other minutes.

Evidence was also introduced to show that the appellant had attempted to conceal the date of his agreement with the Lawsons. As noted earlier, both Mr. and Mrs. Lawson testified that the agreement was signed in late June, 1965, and on their copy the blank spaces for a date were not filled in. On the appellant's copies, however, the date September 10, 1965, had been inserted. That date, which was the date of settlement on the property, was two days after the date of the purported special meeting. Roman H. Ortals, an examiner for the Federal Home Loan Bank Board, testified that during his examination of Havertown in April and May 1969, he had seen a carbon copy of the agreement which was undated. (N.T. 3–92). Ortals produced a photographic copy of the agreement, which had been given to him at the time, which was undated. (G–53). Ortals also stated that he had asked the appellant about the absence of a date, and was told that "it would be difficult to establish the date of contract by the absence of the date." (N.T. 3–100).

The jury might also have found that the appellant had attempted to conceal his interest in Landon Courts, Inc., by having his stock certificates issued in the names of Thomas W. Maher and John G. Siegle.

This evidence provided an ample basis for a jury finding that the appellant had participated or shared in the benefits of the loan, with intent to defraud.

5. Two days before the settlement.

## II. EVIDENTIARY RULINGS

Appellant argues that several of the District Court's evidentiary rulings were erroneous and require a new trial.

■ 1. *The Prosecutor's Remarks to the Jury.* In his remarks to the jury, apparently during the course of selecting the jury, the Assistant U. S. Attorney trying the case mentioned that the trial would be the appellant's second trial for this offense.[6] The remarks, which do not appear on the record, were brought to the attention of the District Court, which cautioned the jury that:

> "[T]he fact that this is the second trial of this case should mean nothing to you. Do you understand that? No inference of any kind should be drawn from that." (N.T. 1–7).

We believe that the District Court's cautionary words were sufficient to cure whatever prejudice, if any, the prosecutor's remarks may have caused in the absence of the caution.[7] Moreover, appellant's counsel answered "No, sir" to the court's question, "Is there anything further I should add, gentlemen?" (N.T. 1–11), and will not be heard now to argue that the judge's cautionary instructions could have been improved through different phraseology. *See* United States v. Morin, 458 F.2d 990 (3d Cir. 1972); United States v. Chicarelli, 445 F.2d 1111 (3d Cir. 1971).

■ 2. *Minutes of the "Special Meeting."* Over appellant's objection, the minutes of the purported special meeting were introduced into evidence. We find no error. The minutes and the accompanying testimony tending to show that the minutes were false were relevant evidence on the issue of appellant's intend to defraud, and we know of no rule of evidence, and have been directed to none, that would exclude the minutes.

■ 3. *The Tape Recording.* During the trial the Court allowed the playing of a tape recording of a telephone conversation between appellant and Mr. Lawson, in which conversation a voice identified as that of the appellant admitted ownership of the shares issued in the name of Thomas W. Maher. Appellant contends that there was no evidence that the tape was authentic and that it did not relate to the incidents in question. These contentions are not borne out by the record. Mr. Lawson testified that he taped the conversation from his kitchen telephone, and that he kept the tapes until September, 1969, when he turned the tapes over to the F.B.I. (N.T. 2–87). James H. McGauley, an F.B.I. agent, testified that the tapes had been in his custody since they had been given to him by Mr. Lawson. (N.T. 4–34 to –35). Although the court reporter notes that "[t]here were instances of unintelligible voices, overlapping voices, and other difficulties" (N.T. 4–46), the part of the tape that is reported shows that the conversation was relevant to show appellant's ownership of shares in Landon Courts, Inc., and thus his participation in the Havertown loans. The fact that his shares were held by Maher for the appellant was also relevant to show that the appellant sought to conceal his interest in the corporation, and thus his intent to defraud.

■ 4. *The Negative Pregnant in Mr. Lawson's Testimony.* This ex-

---

6. The earlier trial had ended in a mistrial when it was discovered, after the case had been submitted to the jury, that the jury had been influenced by certain occurrences extraneous to the trial.

7. At trial the Assistant U.S. Attorney justified his remarks with these words:
   ". . . I had to ask that because I wanted to see if any of the jurors had read the newspaper accounts of it to see if there was any bias, prejudice, or if any opinions had been formed by the jurors." (N.T. 1–3).
   The Government brief suggests that the remarks "were undoubtedly occasioned by the fact that the witnesses had testified at a prior trial and were likely to advert to that fact in their testimony." (Appellee's brief, p. 9).
   In fact, the transcript contains many references to the earlier trial.

change took place in the direct examination of Mr. Lawson by the Assistant U. S. Attorney:

"Q. Have you received any threats or coercion of any sort from any agent, agency, or any arm of the United States Government for being subpoenaed to testify in this case?

"A. Are you talking about threats in general or just from the Government?

"Q. Just from the Government?

"A. No, I haven't had any." (N.T. 2–94).

The appellant argued that the testimony was meant to imply that someone other than the Government had threatened Lawson, and moved to strike the testimony. The motion was denied.

We fail to agree that this isolated exchange constituted reversible error. Appellant's counsel had the opportunity to clarify any uncertainty in Mr. Lawson's testimony through cross-examination, but failed to do so. Even if the jury had been aware of the possible implication in Mr. Lawson's response, we are unwilling to hold that so slight an irregularity in a five-day trial was more than harmless. Fed.R.Crim.P. 52(a).

■ 5. *The Restriction on Cross-Examination of Mrs. Lawson.* The District Court sustained the Government's objection to this question asked of Mrs. Lawson on cross-examination:

"Were you ever indicted in connection with the loan that you obtained from Girard Bank on October 31, 1968 for $2538.72?" (N.T. 2–19).

Before the objection, Mrs. Lawson had answered "No," and her answer was never stricken. Appellant argues that the Court's ruling had the effect of preventing him from showing Mrs. Lawson's bias; *i. e.,* that her testimony was prompted by her desire to avoid prosecution.

The present case is not like Giglio v. United States, 405 U.S. 150, 92 S.Ct. 765, 31 L.Ed.2d 104 (1972). The opinion in that case makes clear that where a key Government witness has been promised that he will not be prosecuted if he testifies, a failure to disclose the promise may deny a defendant due process of law. In the present case, however, there is no evidence that the Government made any such promise to Mrs. Lawson. Appellant's only argument is that his opportunity to question Mrs. Lawson about such a promise was unduly restricted by the District Court's ruling.

The transcript reveals that Mrs. Lawson was questioned at great length about the possibility that her testimony was motivated by promises of non-prosecution. On direct examination she testified that no promises had been made.[8] On cross-examination, defense counsel explored the charges in further detail, and Mrs. Lawson continued to state that there had been no promise not to prosecute her.[9]

---

8. The transcript reveals this exchange:
"Q. Mrs. Lawson with respect to your appearing here today and yesterday, have any promises been made to you by any government agents or agencies that would affect you in your coming trial on the charges with which you are charged.
"A. No.
"Q. Have there been any threats or inducements given to you by the United States Attorney's office, to your attorney or to yourself, that the government will go easy on you when your case comes to trial?
"A. None." (N.T. 2–12 to –13).

9. Part of that cross-examination is as follows:
"Q. . . . And as a result of that [questioning by various government agents] you were indicted?
"A. We were indicted for fraud; right.
"Q. And your husband was indicted?
"A. Yes.
"Q. Is it your intention to plead guilty to those charges?
"A. I am not sure. I don't know.
"Q. Have you had any discussion with anybody about what is to happen to those charges?
"A. Pardon me?

We are convinced that the District Court's ruling does not constitute reversible error. First, Mrs. Lawson had answered the question before objection was made, and the answer was not stricken. Second, we are not convinced that the District Court's order sustaining the objection was meant or was understood to limit further cross-examination about Mrs. Lawson's motive for testifying.[10] Finally, in the light of the witness's unequivocal denials, in several instances, that promises had been made to her, the District Court would have been within its discretion in restricting further cross-examination on the subject. Within the bounds of sound discretion, the trial judge is to exercise his judgment in determining when a particular subject of cross-examination has been exhausted. Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931); United States v. Caserta, 199 F.2d 905, 909 (3d Cir. 1952); United States v. Greenberg, 419 F.2d 808 (3d Cir. 1969). In the present case we are unable to say that the point of exhaustion had not been reached.

6. *Cross-Examination of Appellant.* Appellant became a witness in his own behalf and testified in detail about virtually every aspect of the case. He was cross-examined extensively. Here he argues that in several respects the trial court erred in permitting cross-examination.

A defendant who testifies in his own behalf must expect to be cross-examined on the matters to which he testifies on direct examination. Inconsistencies in his direct testimony may be fully explored. Subject to the trial court's sound discretion, questions may be asked about matters that would tend to impeach the defendant's credibility. *See* United States v. Lowe, 234 F.2d 919 (3d Cir.), cert. denied, 352 U.S. 838, 77 S.Ct. 59, 1 L.Ed.2d 56 (1956); United States v. Sweeney, 262 F.2d 272 (3d Cir. 1959); *see generally* 2 C. Wright, Federal Practice and Procedure § 416 (1969).

We have reviewed the entire record and have examined in particular those parts of the cross-examination that the appellant contends were improper. We find no error. We note, in addition, that there was no objection below to several of the exchanges now assigned as error, and in the absence of plain error we will not notice error not called to the attention of the trial court. *See* Fed.R.Crim.P. 51; cf. Fed.R.Crim.P. 52(b). *See* United States v. Carter, 401 F.2d 748 (3d Cir. 1968), cert. denied, 393 U.S. 1103, 89 S.Ct. 905, 21 L.Ed.2d 797 (1969); United States v. Polack, 442 F.2d 446 (3d Cir.), cert. denied, 403 U.S. 931, 91 S.Ct. 2253, 29 L.Ed.2d 710 (1971).

One point raised by appellant deserves further comment. Appellant argues that he "was cross-examined

"Q. Have you had any discussion with anybody about what is to happen to those charges?
"A. I don't understand you.
"Q. Did anybody tell you the charges would be dropped?
"A. No.
"Q. Did your lawyer tell you that you are going to plead guilty to them?
"A. He didn't tell me anything yet." (N.T. 2-16 to -17).

10. The Government's attorney's objection to the question was clearly grounded upon the established principle that a party may now show, for the purpose of impeaching a witness's credibility by attacking his character, that the witness has been ar-

rested or indicted. (N.T. 2-19 to -20). IIIA Wigmore on Evidence § 980a (Chadbourn rev. 1970). After the objection was sustained, defense counsel continued to question Mrs. Lawson about the loan that had been the subject of his earlier question. (N.T. 2-24).

We accept, however, the appellant's argument that a District Court would commit error if it refused to allow defense counsel to ask a Government witness if his testimony had been induced by promises of leniency or non-prosecution. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *see* Beaudine v. United States, 368 F.2d 417 (5th Cir. 1966).

concerning an arrest for an assault and battery which did not result in a conviction." (Appellant's Brief, p. 9). The transcript shows that this is not a case where, to impeach a witness's credibility, the opposing party attempts to show that the witness has been arrested. *See* IIIA Wigmore on Evidence § 980a (Chadbourn rev. 1970). The arrest for assault and battery was first mentioned in the cross-examination of appellant's character witnesses. That cross-examination was clearly proper. Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); United States v. Stringi, 378 F.2d 896 (3d Cir.), cert. denied, 389 U.S. 846, 88 S.Ct. 100, 19 L.Ed.2d 113 (1967). In his direct examination the appellant testified in detail about the same arrest. (N.T. 4–98 to –100). It was not error for the trial court to allow the Government to cross-examine the appellant about the arrest. *See* Martin v. United States, 404 F.2d 640 (10th Cir. 1968).

■ 7. *Evidence of Appellant's Rejection for Membership by the Board of Realtors*. That appellant's application for membership had been rejected by the Delaware County Board of Realators was first brought into the trial in the cross-examination of P. Ronald Pilot, a character witness for the appellant. Mr. Pilot answered that he had heard about the rejection. (N.T. 4–82). Later in the trial William Thomas Shea, Jr., and Edwin G. Marder, other character witnesses for appellant, were asked on cross-examination about the rejection, but they had not heard of it. (N.T. 4–91, 4–95). These questions were proper. Michelson v. United States, *supra*; United States v. Stringi, *supra*.

After the character witnesses had testified, appellant himself was called as a witness. He was asked on direct examination about his rejection for membership in the Board of Realtors. Appellant answered, at some length, that his rejection had resulted because he had refused to raise his commissions to levels set by the Board of Realtors and because he

had, as a non-member, approached customers of Board members. (N.T. 4–97 to –98).

In rebuttal, the Government called Edgar G. Warner, Executive Vice President of the Board of Realtors. Warner testified that appellant's application for membership had been rejected not because he charged lower commissions or approached members' customers, but for unethical business practices. Specifically, Warner pointed to complaints that appellant had interfered with members' exclusive listing contracts. (N.T. 5–72 to –73). Warner was subjected to intense cross-examination by defense counsel.

■ Appellant argues that it was error to allow the Government to call the witness in rebuttal. We find no error. Appellant himself opened up the subject of the reason for his rejection, and the Government's rebuttal testimony merely contradicted the reasons given by the appellant. It is well established that the admission of rebuttal evidence on collateral matters is entrusted to the sound discretion of the trial judge. United States v. Riccardi, 174 F.2d 883, 890 (3d Cir.), cert. denied, 337 U.S. 941, 69 S.Ct. 1519, 93 L.Ed. 1746 (1949); United States v. Vivero, 413 F.2d 971 (2d Cir. 1969), cert. denied, 396 U.S. 1017, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Brooke v. United States, 128 U.S.App.D.C. 19, 385 F.2d 279, 286 (1967). Here we cannot say that the trial judge overstepped his discretion in allowing the Government to rebut the testimony given by the appellant on direct examination. *See* United States v. Glaziou, 402 F.2d 8, 16 (2d Cir. 1968), cert. denied, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969); Schoepflin v. United States, 391 F.2d 390, 396 (9th Cir.), cert. denied, 393 U.S. 865, 89 S.Ct. 146, 21 L.Ed.2d 133 (1968); *cf.* United States v. Beno, 324 F.2d 582, 588 (2d Cir. 1963), cert. denied, 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 86 (1964).

For the reasons stated, the judgment of conviction will be affirmed.