UNITED STATES of America, Appellee,

v.

Charles Thomas GRIFFIN and Joe Henry Chambers, Appellants.

Nos. 77–1597, 77–1601.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1978.

Decided June 29, 1978.

Rehearing and Rehearing En Banc Denied July 28, 1978.

Leon B. Catlett, Little Rock, Ark., argued and on brief, for Griffin.

Steven L. Festinger, Little Rock, Ark. (argued) and Dale Price, Little Rock, Ark., on brief, for Chambers.

W. H. Dillahunty, U. S. Atty., and Samuel A. Perroni, Asst. U. S. Atty., Little Rock, Ark., argued and on brief, for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, HENLEY, Circuit Judge, and LARSON, Senior District Judge.*

VAN OOSTERHOUT, Senior Circuit Judge.

On November 1, 1976, the federal grand jury returned a five-count indictment against Charles Thomas Griffin, Joe Henry Chambers and Bill Hansell. Not guilty pleas were entered. Upon a joint trial to a jury, commencing on June 20, 1977, defendant Griffin was found guilty on Counts I, II and V. Defendant Chambers was found

---

* The Honorable Earl R. Larson, Senior United States District Judge, District of Minnesota, sitting by designation.

guilty on Counts I and III and not guilty on Count V.[1]

Griffin and Chambers have each filed a timely appeal from their conviction. The defendants were jointly tried below and their cases are consolidated upon this appeal. Each defendant has filed separate briefs. Hansell has not appealed from his conviction.

Count I alleges a conspiracy on the part of the defendants to violate 18 U.S.C. § 1006. Count II charges Griffin with violation of 18 U.S.C. § 1006. Count III charges Chambers with violation of 18 U.S.C. § 1006. Count IV involves a charge against Hansell not here material. Count V charges defendants with violation of 18 U.S.C. §§ 1014 and 2.

Griffin relies upon the following points for reversal:

I. Prejudicial conduct of the Assistant United States Attorney in reading in part of his opening statement written statements given to Government investigators.

II. Failure to dismiss Count II as defective.

III. Failure to dismiss Count V.

IV. Error in admitting evidence of repurchase of 2,880 acres.

V. Error in admitting evidence of other transactions.

VI. Error in permitting Boggess to testify.

VII. Failure to produce *Brady* material and denial of admission of certain minutes of Lonoke PCA.

Chambers makes the same contention with respect to Count III as Griffin does with respect to Count II. He also relies upon points I, III, IV, V, VI and VII asserted by Griffin. Such errors will be discussed jointly with respect to both appeals.

Chambers urges the following additional points:

VIII. Refusal to grant a severance.

IX. Error in instructions.

For the reasons hereinafter stated, we reject each of the contentions made and affirm the convictions.

The trial was a long one. The record is very extensive. A complete analysis of the facts and issues would unduly extend this opinion without serving a significant useful purpose. We shall summarize some of the pertinent facts bearing upon the issues raised. There is a dispute as to some of the material facts. However, in light of the jury verdict in favor of the Government, we view the evidence in the light most favorable to the Government as the prevailing party, and the facts are stated with this principle in mind. The Lonoke Production Credit Association (PCA) is a federally-chartered instrumentality of the United States under the supervision of the Federal Intermediate Credit Bank of St. Louis, Missouri, and the Farm Credit Administration. Griffin was president and Chambers was vice president of Lonoke PCA. Hansell was manager of the East Lonoke branch.

In 1973 Huntsman, a large farm operator, contacted Griffin in an effort to secure financing for his farming operations. Huntsman was told by Griffin that Hansell would take care of his needs. Huntsman was unsuccessful in obtaining 1973 crops loans and had no success with his 1974 application. He was told St. Louis was fussing about Huntsman's not having sufficient farming operations in the Association's territory.

In July 1974 Hansell visited Huntsman and suggested the purchase of a 2,880 acre tract of land which Hansell said would make it easier for the PCA to give him his desired line of credit. Hansell said Griffin was waiting for a call to him of Huntsman's decision on the purchase and that PCA could finance 100% of the purchase price. Huntsman, with some reluctance, agreed to buy the land. A loan application for $513,-800 was prepared and was signed by Hunts-

---

1. Griffin was sentenced to fifteen months imprisonment on each count, to be served concurrently, and was fined $10,000 on Count I, $5,000 on Count II and $5,000 on Count V.

Chambers was sentenced to fifteen months imprisonment on each of Counts I and III, to be served concurrently, and was fined $5,000 on Count I and $2,500 on Count III.

man. The application states the loan is a crop loan. The loan application was approved by the PCA loan committee of which Griffin was an influential member.[2]

The involved 2,880 acre farm was purchased by Griffin, Chambers and Hansell for $470,000 in late July of 1974 with title taken in the name of O. M. Young, Trustee.[3] The Brauer land was encumbered by existing encumbrances of $341,680 which were assumed by the purchasers with a balance of $129,000 to be paid in cash at the time of closing. Huntsman's purchase price was $634,000, or $164,000 more than Brauer's selling price. The beneficial ownership of the land was not disclosed to Huntsman or to the supervising Government agencies.

On July 24, 1974, the PCA disbursed the proceeds of the crop loan, paying $121,433 for the release of a bank crop lien and issuing a check to Huntsman for $386,600.

Hansell refused to deliver the check for the loan proceeds to Huntsman, and at Hansell's insistence, Hansell and Huntsman went to the First National Bank in Little Rock where at Hansell's direction Huntsman endorsed and deposited the check for $386,600 and received a cashier's check made out to Young, Trustee, for $292,319.18, which was the amount due on the purchase above the assumption of existing encumbrances on the land. Hansell took possession of such check and delivered it to Young. The check was deposited to Young's trust account. Shortly thereafter Young issued a check on the trust account for $20,000 to Chambers and checks for $71,000 each to Griffin and Hansell. The remaining $2,000 was retained by Young as a fee. Telephone records were received in evidence showing numerous phone calls between Griffin and Young and others interested in the transaction on July 24 and that Young had a telephone conversation with Chambers on that date. Huntsman, after

the payments hereinabove referred to, received a balance of about $80,000 to be used for crop loan purposes and had difficulty in meeting the expenses of his farming operation. Huntsman in August 1974 received an additional crop loan of $125,000, and repeated efforts to obtain additional financing were unsuccessful.

On December 1, 1974, a payment on the indebtedness assumed by Huntsman became due. At the time of the purchase by Huntsman neither Brauer nor Huntsman knew that a $164,000 profit had been made on the sale, and Huntsman was not aware of the fact that defendants were the equitable owners of the real estate at such time. On March 7, 1975, Huntsman learned of the true ownership of the land which he purchased and the profit that had been made. The following day Huntsman visited Hansell and threatened to report the violation by the defendants of the conflict of interest statute and regulation. Hansell admitted that a profit had been made on the deal and that it was unlawful for the PCA officers to do what they had done, urged Huntsman not to go to the FBI, and stated that he would comply with anything Huntsman asked. Shortly thereafter a meeting was held between Hansell, Huntsman and Boggess wherein Boggess agreed to buy the farm for $662,000, which was approximately Huntsman's purchase price. Boggess brought Huntsman an option agreement and a $25,000 check drawn on the account of O. M. Young. On March 25, 1975, the purchase of the farm was completed with Boggess paying Huntsman and the PCA $302,000, which was credited on Huntsman's debt to PCA. The balance of the repurchase was the assumption of the existing mortgage indebtedness.

The Huntsman-Boggess closing took place in Young's office with Chambers, Young, Boggess and Huntsman and his attorney being present. It is established that

---

**2.** Real estate loans could be made by the PCA but the procedures for such loans differed significantly from those with respect to crop loans. Appraisals and title examinations were required for real estate loans.

**3.** It is not clear from the record whether defendants committed themselves to purchase the Brauer land prior to obtaining Huntsman's purchase agreement.

Griffin, Chambers and Hansell put up the money for the Boggess purchase and induced Boggess to give a false statement to Government investigators with respect to his involvement in the purchase. The PCA loan was paid in full, and no money was lost by PCA as a result of the Huntsman loan. Additional facts to the extent necessary will be set out in the course of the opinion.

We shall now consider the asserted errors in the order hereinabove stated.

## I.

 Defendants urge that the Assistant United States Attorney engaged in improper conduct during opening argument when he read portions of the signed statement of each defendant to the jury upon the basis that any conspiracy which might have existed was terminated prior to the giving of the statements to the Government investigators and that consequently the statements were inadmissible to the extent that they involved defendants other than the defendant making the statement. At that point no motions had been made to suppress the statements. The statements had been furnished defendants as part of the discovery procedure. No objection was made at the time the statements were read nor was a motion for mistrial on that ground made. Such failure precludes raising the claimed error upon appeal. *See United States v. Lawson*, 483 F.2d 535, 538 (8th Cir. 1973); *United States v. DeRosa*, 548 F.2d 464, 471–72 (3d Cir. 1977). Moreover, Griffin's attorney in opening statement admitted nearly all of the facts referred to in Griffin's statement concerning the purchase and sale of the farm but denied criminal intent. The statement of each defendant admitted the receipt of profits in the substantial amounts shown in the Young disbursements hereinabove.

 Before defendants' statements were admitted in evidence all references to codefendants were deleted, and the jury was advised that statements of counsel did not constitute evidence. We are satisfied that no prejudicial error was committed with respect to the attorney's opening statement.

*See United States v. Powell*, 564 F.2d 256, 259–60 (8th Cir. 1977); *United States v. Killian*, 524 F.2d 1268, 1273–75 (5th Cir. 1975).

## II.

 The contention of defendants that the allegations of Count II of the indictment as to Griffin and Count III as to Chambers, charging violation of 18 U.S.C. § 1006, are fatally defective lacks merit. Four elements are required to be proved in order to establish a violation of Title 18 U.S.C. § 1006. They are: (1) that the defendant is an officer or employee of a lending institution organized under the laws of the United States; (2) that the defendant participated, shared in or received, either directly or indirectly, money, profit or benefit by and through any transaction of such institution; (3) that the defendant did such act or acts with intent to defraud the association; and (4) that such act or acts were done knowingly and willfully. *United States v. Hykel*, 461 F.2d 721 (3d Cir. 1972).

Counts II and III of the indictment tell the appellants exactly what they were supposed to have fraudulently received, and the exact transaction involved, *i. e.*, the disbursement of an Association check in the amount of $386,600 payable to Harold and Maudie Huntsman which purportedly represented the proceeds of a Huntsman crop loan.

In *United States v. Brown*, 540 F.2d 364, 371 (8th Cir. 1976), we held:

An indictment must set forth in factual terms the elements of the offense sought to be charged. It must sufficiently apprise the defendant of what he must be prepared to meet, and its generality must not endanger his constitutional guarantee against double jeopardy. (Supporting citations omitted.)

The record in our present case clearly reflects that the defendants were fully aware of the charges against them and that their double jeopardy rights are fully protected.

### III.

■ Both Griffin and Chambers urge that the court erred in denying their timely motions for acquittal on Count V. This count alleges that the defendants knowingly and willfully violated 18 U.S.C. §§ 1014 and 2 in that they caused Huntsman to make a false statement that the loan applied for was a crop loan when in fact they knew that a major portion of the loan was to be used to purchase the 2,880 acres, and that they thereafter approved the loan, or that they aided and abetted in such transaction. Our examination of the record satisfies us that there is substantial evidence to support the charge. Griffin was convicted on Count V. Chambers was acquitted on Count V. The case against Griffin, who was a member of the committee that approved the loan, is stronger than that against Chambers.

Chambers further contends that the refusal to dismiss Count V permitted the reception of evidence that would have been excluded if the dismissal motion had been granted.

We hold that the court committed no error in submitting Count V to the jury.

### IV.

■ The court committed no error in admitting buy-back evidence relating to the 2,880 acres with respect to Counts II and III. Admission of evidence is committed to the broad discretion of the trial court and the trial judge's ruling should not be disturbed absent a clear showing of abuse of discretion. *United States v. Baumgarten*, 517 F.2d 1020, 1029 (8th Cir. 1975). The buy-back evidence was relevant and material on the issue of knowledge and intent with respect to Counts II and III. See Rules 401–402, Federal Rules of Evidence. The court by proper instruction limited consideration of the buy-back evidence to Counts II and III. Accordingly, we need not reach the Government's contention that the evidence was admissible as to Count I.

### V.

■ Defendants challenge the admission of evidence concerning other similar transactions. Rule 404(b). Federal Rules of Evidence, provides:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This court in *United States v. Maestas*, 554 F.2d 834, 836 (8th Cir. 1977), held:

Our task is to assess the relevancy and the probative value of the challenged evidence; if it meets the requirements of Rule 404(b) we may not reverse the ruling of the District Court unless we also find that the prejudice from admitting the evidence substantially outweighed its probative value. In making that evaluation, we must give great deference to the district judge, who saw and heard the evidence.

The record reflects that the trial court held three hearings on the admissibility of the other transactions evidence and was advised, as was defense counsel, of the general facts surrounding each transaction. The defense had several months to meet the proposed evidence. The court limited the prosecution to similar transactions which involved land deals in which Griffin and Chambers were involved, where loan proceeds were used in whole or in part to buy land in which Griffin and Chambers had an interest and where deception and concealment were involved. Our examination of the record satisfies us that the trial court did not abuse its discretion in admitting the challenged evidence.

### VI.

■ Boggess was a straw man used by the defendants to repurchase the 2,880 acres from Huntsman. Boggess had refused to testify before the grand jury on the basis of self-incrimination. He was ulti-

mately granted immunity by appropriate proceedings. Defendants contend Boggess should not be allowed to testify since he had attended several meetings of defendants with their counsel. At such time Boggess was represented by the same attorney who represented Hansell and he attended the meetings at the attorney's request. The Court, upon the basis of substantial evidence at an in camera evidentiary hearing, found Boggess was not a Government informer or spy and that he did not disclose any defense strategy to the Government. Both Boggess and the Government specifically denied any disclosure of defense strategy to the Government.

Defendants further complain that they did not learn of the grant of immunity until the fifth day of the trial and that such information should have been disclosed earlier in order to enable defendants to propose questions on voir dire as to whether they would consider the granting of immunity in determining the credibility of a witness. We find such contention lacks merit. Defendants knew for a considerable time that Boggess had been subpoenaed by the Government as a witness. Defendants had an opportunity to argue to the jury the bearing of the immunity on Boggess' credibility. Boggess' testimony was very damaging to the defendants. He stated that he had had several conferences with Griffin, Chambers and Hansell and that he was their friend. He said that he acted as purchaser at defendants' request and that all the money for the repurchase was provided by the defendants. We disagree with defendants' contention that Boggess' testimony, which was admitted only with respect to Counts II and III, had no relevancy to such charges. We also disagree with the claim that the relevancy is substantially outweighed by danger of unfair prejudice.

### VII.

■ Defendants at several stages filed motions for disclosure of material favorable to the defense. The claimed favorable material is contained in the PCA minute book and reads as follows:

Gentlemen, Mr. McGuire explained that an FCA investigation team had discovered that violations of FCA rules and regulations apparently have been committed and that the employment of Charles Griffin and Bill Hansel had been terminated. He was direct, emphatic and explicit that criminal violations were not involved.

Mr. McGuire was the president of the Federal Intermediate Credit Bank of St. Louis. The record reflects that neither the Government nor its investigators had possession or knowledge of such minutes and that they were discovered when the minute books were produced on the fifth day of the trial. The minutes disclose information unfavorable to the defendants in that Griffin had been discharged for violation of association rules. The favorable portion of the minutes was that McGuire expressed the bald assertion that criminal violation was not involved. The tender of the quoted minutes was denied upon the ground that it constituted an inadmissible conclusion of the witness. It is doubtful whether the expression of an expert opinion on guilt or innocence can be given by a witness. Such issue is appropriately determined by the jury under appropriate instructions by the court.

In any event, the statement was made some three months before the indictment. McGuire was not shown to be in possession of all the facts nor was he shown to be an expert qualified to pass on the criminal guilt issue. The court committed no error in determining that there was no *Brady* violation and did not abuse its discretion in refusing to admit the tendered extract from the minutes. The trial continued for nine days after the defendants' knowledge of the minutes and a four-day recess intervened. The court properly denied a continuance as ample time remained for the defendants to make any desired investigation as to the subject matter of the minutes.

### VIII.

■ Chambers complains of the court's denial of a severance. Chambers participated in the same transactions as his code-

fendants. Joinder was proper under Rule 8(b), Federal Rules of Criminal Procedure. In *United States v. King* and *United States v. Lewis,* 567 F.2d 785, 788 (8th Cir. 1977), we held no abuse of discretion arose from the denial of Lewis' motion for severance. We stated:

> Even if joinder is proper under Rule 8, Fed.R.Crim.P. 14 authorizes the trial court to grant relief from joinder "[i]f it appears that a defendant or the government is prejudiced by [the] joinder . . . ." The court "may order . . separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." *See United States v. Sanders,* 563 F.2d 379, at 382 (8th Cir. 1977). A district court in determining whether to grant relief under Rule 14 has wide discretion and the court's ruling is rarely disturbed on review.

We find no abuse of discretion on the part of the trial court in denying Chambers' motion for severance.

### IX.

■ Chambers contends the court's instructions on intent to defraud the association are inadequate and erroneous. Chambers also contends the court erred in refusing to instruct on his theory of defense. We have reviewed the court's instructions on intent to defraud as a whole and find no prejudicial error was committed. As stated in *United States v. Hykel,* 461 F.2d 721, 724 (3d Cir. 1972), quoting with approval from *Beaudine v. United States,* 368 F.2d 417 (5th Cir. 1966):

> [T]his part of 18 U.S.C. § 1006: "is intended to do much more than forbid unsophisticated embezzlement, larceny or theft. And that part of the statute with which we are concerned is a typical conflict of interests prohibition. As such it is a congressional recognition of the principle so well grounded in morality and equity that the servant cannot serve two masters and that when this is done without complete disclosure, the law considers that the master-principal's interests either will, or are apt to, suffer."

Chambers complains of that part of the instructions which states that the evidence need not show that the PCA suffered any financial loss and that a showing that the accused acted with intent to defraud is sufficient. The Government suffered no financial loss as the loan was repaid. As stated in *Hykel, supra* at 725:

> The fact that Havertown and the United States may have suffered no loss through the transaction does not preclude a finding of intent to defraud.

The court's instructions in the present case clearly place the burden on the Government to show an intent to defraud beyond a reasonable doubt. Defendants had signed statements that they were familiar with the applicable regulations relating to conflict of interest. The evidence here clearly shows a conflict of interest and supports a finding of intent to defraud a Government agency by not revealing the conflicting interests to the supervising agencies. Defendant's contention that the court erred in failing to submit his theory of the case lacks merit. The tendered defense that Chambers is a licensed real estate agent and that the $20,000 received on the sale was a commission finds no support in the evidence. The evidence reflects that the sale was negotiated by Hansell and that Chambers had nothing to do with the selling except to acquiesce in the sale and accept his share of the profits.

The extensive record developed at a lengthy trial and the numerous errors asserted make it impractical to discuss all facts and issues in greater detail. No useful purpose would be accomplished by a more detailed discussion of the facts and issues. We have fully considered all of defendants' contentions including those not discussed and are convinced that the defendants had a fair trial, that substantial evidence supports the jury verdicts, and that no prejudicial error was committed by the trial court nor did it abuse its discretion upon issues lying within its discretion.

The convictions are affirmed.