UNITED STATES of America
v.
Michael NEWMAN and Frank X. Gaca.
Appeal of Michael NEWMAN.
No. 72–1664.

United States Court of Appeals,
Third Circuit.

Argued Dec. 4, 1972.

Decided March 29, 1973.

---

Richard L. Thornburgh, U. S. Atty., James M. Seif, Kathleen Kelly Curtin, Asst. U. S. Attys., Pittsburgh, Pa., for appellee.

Thomas A. Livingston, Livingston & Miller, and John L. Doherty, Pittsburgh, Pa., for appellants.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This appeal by Michael Newman challenges his June 22, 1972, sentence 'and judgment.[1]   Newman, who was at the

---

1. After the jury returned its verdict of guilty, Newman promptly filed a motion for new trial alleging 14 reasons in sup-

port.   The trial court found the points urged by the defendant to be without merit, but 4½ months later *sua sponte*

time a City Councilman in McKeesport, Pennsylvania, had been convicted by a jury on Count I of a two-count indictment,[2] which charged him with willfully procuring another person to intercept telephone conversations in violation of 18 U.S.C. §§ 2511(1)(a) and 2.[3] We affirm.

The evidence adduced at Newman's trial revealed that on March 3, 1970, Thomas Nee, a former Bell Telephone employee and a political associate of Newman, installed a tape recorder and activator on the telephone line of Mr. and Mrs. Eugene O'Neill. Nee, the chief Government witness, testified that Newman directed him to undertake the interceptions in order to collect politically useful information of the plans of Newman's opponents (N.T. 93–94).

The interceptions continued for approximately one week. Each day Nee would service the recording device by removing the tape recorder from the telephone line and later playing the contents of the tape for Newman (N.T. 108–121). The tape recorder was discovered when Nee apparently inadvertently set it on broadcast, rather than record (N.T. 124). Nee was indicted for his participation and subsequently entered a plea of guilty.

The defendant urges each of three contentions as a basis for reversal:

I. The trial court erred when it denied him the opportunity to call the United States Attorney as a witness to impeach Nee's credibility.

II. The trial court erred when it refused his request, made in the midst of the trial, to hear the contents of the tape found on the tape recorder. Neither the tape nor its contents were received in evidence.

III. The trial court committed plain error in its charge to the jury.

We shall consider these contentions in the above order.

## I.

Newman contends that he has been denied his Sixth Amendment right to compulsory process. Specifically, he argues that the refusal by the trial court to allow him the opportunity to call the United States Attorney thwarted his efforts to impeach the credibility of Nee by showing a bargain had been reached between the Government and Nee concerning the sentence for Nee's admitted participation in illegal electronic surveillance and his possible prosecution for perjury before the grand jury.

Newman claims Nee's explicit denial of a bargain on cross-examination [4] was

granted a new trial based on its "injudicious indulgence in witty diversities." The Government filed a petition for a writ of mandamus to compel the district court to vacate its order granting the new trial on the basis that the court's order was entered not for reasons in the defendant's timely new trial motion, but on grounds raised by the district court months after such motion and answer to such petition. The district court's order was vacated and the defendant directed to appear for sentencing. *United States v. Newman,* 456 F.2d 668 (3d Cir. 1972).

2. A motion for acquittal as to Count II of the indictment, which charged a violation of 18 U.S.C. §§ 2511(1)(c) and 2, was granted at the completion of the Government's case.

3. 18 U.S.C. § 2511(1)(a) provides:
   "(1) Except as otherwise specifically provided in this chapter any person who—

(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication; . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both."

18 U.S.C. § 2 provides:
   "(a) whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   "(b) whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

4. The following conversation took place between Nee and Newman's counsel during cross-examination:
   "*Q. Sir, you have been made no promises or no threats have been made*

inconsistent with the following statement made by the United States Attorney during a conference outside of the presence of the jury ("he" refers to Nee):

"He indicated if we indicate our good faith as best we can that he will disclose these facts at that time and we will then proceed to prosecute those persons who are responsible, but he has a Fifth Amendment right to I think avoid getting into those other offenses." (N.T. 146)

Newman reads that statement to suggest that Nee had agreed to testify about previous wiretaps he had undertaken involving persons not connected with the trial in return for preferential treatment. However, the record, as a whole, makes clear that the United States Attorney's statement does not support that contention. Nee, instead of agreeing to testify in future trials, "steadfastly refused to tell . . . about them because he [was] in genuine fear of physical harm" (N.T. 145). The reason behind the out-of-court discussion, as the prosecutor made clear, was a concern that the court, by one of its questions, had opened the door to cross-examination concerning the details of the previous wiretaps. The United States Attorney felt that if Nee refused to answer the questions and relied on his Fifth Amendment right to remain silent, his credibility would be damaged.[5]

against you concerning your testimony in this case?

"A. No, sir, no threats have been made or no promises have been made.

"Q. Have you had any discussion with any member of the U.S. Attorney's office concerning what information you will provide to the United States Attorney after sentence is imposed upon you?

"A. I have promised them nothing.

"Q. Have you made any indication to the United States Attorney's office concerning what you might do in the event that they show their good faith?

"A. No, sir, I told them I would testify fully and truthfully in this case, and that is all I said I would testify under the other situations.

"Q. Was it then your indication to the United States Attorney's office that you would never testify against anybody except the defendant, Michael Newman.

"A. No, I didn't say anybody. I said under certain situations that they were talking about. I didn't say anybody.

"Q. Did you indicate a willingness after the United States Attorney's office shows their good faith to cooperate further with them?

"A. No, sir. I said I would never testify in other incidents, that they would never get me on the stand." (N. T. 318–19).

5. In chambers the prosecutor stated:

"As I size him up, he is not pulling my leg, and it involves some racket connections in McKeesport, and I have tried to studiously avoid getting into that, and I am sure your Honor asked a perfectly logical question and maybe it would have been relevant in cross-examination anyway, but I am a little concerned about him being forced to answer these things because he seems to express a genuine fear of bodily harm with expression of distress of any disclosure of for whom these jobs were done.

.        .        .        .

"So far as we are concerned—and I hate like the dickens to have him take the Fifth Amendment out there in the courtroom, and I am in a quandary as to what to do. Now that your Honor has raised the question in doing other jobs—

.        .        .        .

"I don't want to have [counsel] ask a question when he knows he is going to get a Fifth Amendment response because I think it goes improperly to the credibility of the witness. He has a constitutional right, but in this day and age, the Fifth Amendment, I think juries react to it . . . " (N.T. 145, 146, 149).

We note, nevertheless, that except on grounds of relevancy, there was no limitation on defense counsel's cross-examination of Nee. The trial judge said:

". . . conceivably [defense counsel] might ask some questions that were entirely outside of the ballpark and to which objection might be made and sustained without the necessity of the witness pondering whether he could safely answer them or not, but I suppose the proper procedure would be to wait until the questions are asked and then hear what objections are made . . . " (N.T. 169–170)

In the alternative, Newman suggests the United States Attorney's statement may be read as a suggestion that Nee had agreed to disclose other facts in prosecutions against other persons in return for an indication of "good faith" by the prosecutor not to prosecute him for his possible previous perjury before the Grand Jury. This suggestion is equally misplaced. The court conducted a lengthy discussion out of the hearing of the jury, where the prosecutor denied the existence of any bargains, and he emphasized that his office had not reached a decision on whether to prosecute Nee for perjury.[6]

■■■ Although this court has consistently held that defense counsel has available the right to show that the testimony of a Government witness was given in reliance on a promise of a lighter sentence, or other preferential treatment, United States v. Murray, 445 F.2d 1171, 1174 (3d Cir. 1971); *e. g.,*

---

6. After Newman's attorney repeated the statement made by the United States Attorney, the following conversation took place at sidebar:

"MR. THORNBURGH [United States Attorney]: What kind of a deal is that?

"THE COURT: What does this have to do with this case? It is the gleam in the eye of Mr. Thornburgh to have some more.

"MR. LIVINGSTON [defense counsel]: I think it requires Mr. Thornburgh to answer the question whether or not he has made any promises not to prosecute Nee for perjury, whether he has made any promises. I think he must answer these questions, whether he has made any promises not to prosecute Nee for intimidating witnesses when the matter has been brought to his attention, and I think if he answers those questions in the negative, I think I fall flat on my face, and I am willing to rest. That is the thing in a nutshell, I think the record is clear, and, very frankly, in the present state of the record, although for the record I insist that he testify with the record clear, it doesn't upset me a great deal if the court rules that he will not and I walk away and that is the end of the ballgame.

"THE COURT: It seems to me that it is unrelated to this case, that it is more about what he hopes to accomplish by a brilliant conviction in this case. Maybe he will get a couple more customers.

"MR. LIVINGSTON: Well, I am inclined, your Honor, to think that really there is no way—this witness was asked if he made any deals. He said no. I am talking about Nee. Now, I don't know whether [the United States Attorney] hasn't prosecuted him for perjury—

"MR. THORNBURGH: . . . you know full well the practice of a prosecution office when a man purges himself of perjury. You know that. We don't go around prosecuting people without giving them a chance. We can't.

"MR. LIVINGSTON: Now, wait a second. I don't mean this in the sense of unethical impropriety. I mean in the sense that I think it is improper for you to make the determination that he purged himself of perjury the second time.

"MR. THORNBURGH: I make every determination in our office as to who is prosecuted, and you know full well we decline a basketful of prosecutions every week.

"MR. LIVINGSTON: But what you are doing here is saying, in effect, that he has purged himself of perjury the second time.

"MR. THORNBURGH: I don't know at this point, but I am not going to prosecute him at this point.

"MR. LIVINGSTON: For example, if it was brought to your attention that he perjured himself the second time—

"MR. THORNBURGH: We could consider it. These are matters within the discretion of the prosecutor's office, and I think this is just a grandstand play, your Honor, and I resent it very much. There is no basis in that scrap of paper for thinking a deal has been made with Mr. Nee.

"MR. LIVINGSTON: I think that becomes a jury question.

"MR. THORNBURGH: You're right, I said I hope we could make some more cases if this person gets rid of the idea everything is fixed in McKeesport, but the idea of—

"MR. LIVINGSTON: That he will disclose those facts at that time.

"MR. THORNBURGH: . . . .— we made no deal. I didn't say to Tom Nee, and there is absolutely no basis in that piece of paper for you making that kind of statement—" (N.T. 644–646).

United States v. Migliorino, 238 F.2d 7 (3d Cir. 1956), the district court has wide discretion with respect to the examination of witnesses. Hayes v. United States, 329 F.2d 209, 218 (8th Cir. 1964). It may properly refuse to allow the defense to call the prosecutor if it does not believe that "he possesses information vital to the defense." Gajewski v. United States, 321 F.2d 261, 268–269 (8th Cir. 1963); cf. Fisher v. United States, 231 F.2d 99 (9th Cir. 1956); see also United States v. Maloney, 241 F. Supp. 49 (W.D.Pa.1965).

The decision in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 765, 31 L. Ed.2d 104 (1972), does not aid Newman's claim that the district court's refusal to allow him to call the United States Attorney mandates a new trial. The rationale underlying the Court's determination in Giglio is inapplicable to the facts presented in this record. Giglio dealt with evidence of a promise of freedom from prosecution for a key government witness, discovered after the trial, which was inconsistent with explicit denials of leniency made both by that witness and the prosecutor during the trial. In that situation, the Court felt, the suppression by the prosecutor's office of what was material evidence deprived the defendant of his due process rights as guaranteed in Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L. Ed.2d 1217 (1959), and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215 (1963). See Giglio, supra, 405 U.S. at 154–155, 92 S.Ct. 765.

Here, however, there is no evidence that the prosecutor suppressed evidence. The prosecutor explicitly denied to the court, on the record, both as a member of the bar and as an officer of the court, making any bargains or agreements with Nee. In United States v. Hykel, 461 F.2d 721 (3d Cir. 1972), the defendant contended that he had been prevented from showing that the testimony of a witness was prompted by her desire to avoid prosecution. Judge Hunter explained:

"The present case is not like Giglio v. United States, 405 U.S. 150, 92 S. Ct. 765, 31 L.Ed.2d 104 (1972). The opinion in that case makes clear that where a key Government witness has been promised that he will not be prosecuted if he testifies, a failure to disclose the promise may deny a defendant due process of law. In the present case, however, there is no evidence that the Government made any such promise to Mrs. Lawson."

461 F.2d at 727; cf. United States ex rel. Dale v. Williams, 459 F.2d 763, 765 (3d Cir. 1972).

We believe that on these facts the court properly concluded that Newman's request was "irrelevant to this case. . . . ." (N.T. 647).

## II.

Newman next contends that the failure by the trial court to grant his request for the examination and use, if relevant, of a tape of the private phone conversations of the O'Neill family that had been made available to Nee prior to the trial, precluded him from developing his defense. This motion for discovery was made on the morning of the fourth day of the trial.[7] Defense counsel did not seek to examine this tape even though Nee had concluded his testimony, including his cross-examination, and the prosecution had rested at the end of the third day of trial. The tape could have been requested and examined the pre-

7. The following conversation took place when Newman's attorney requested the United States Attorney to provide him with any exculpatory evidence that had come to his attention:
"Mr. Livingston: I would . . . request the opportunity to listen to this particular tape to determine what if any exculpatory matters may appear on it which can be used to the defendant's benefit.

. . . . .

"The Court: Do you have any known exculpatory material?
"Mr. Thornburgh: I have none . . I have never heard so much as one fragment of that tape." (195a–196a, N.T. 397).

vious evening without causing a trial delay.

■ An application for discovery under Rule 16 of the Federal Rules of Criminal Procedure is addressed to the sound discretion of the trial court, "and its ruling will be disturbed only for an abuse of discretion." United States v. Fioravanti, 412 F.2d 407, 410 (3d Cir.), cert. denied, Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L. Ed.2d 88 (1969); United States v. Randolph, 456 F.2d 132 (3d Cir. 1972). As Judge Aldisert has noted:

> "Appellate courts have been increasingly reluctant to find that the denial of a particular discovery motion was an abuse of discretion in the absence of a showing that the defendant was prejudiced by such denial." *Fioravanti, supra,* 412 F.2d at 410.

In addition, Rule 16(f) of the Federal Rules of Criminal Procedure provides that the trial court may deny an untimely motion for discovery where the defendant has failed to show cause "why such motion would be in the interest of justice." *Cf.* United States v. Conder, 423 F.2d 904 (6th Cir. 1970). The 1966 Advisory Committee Note to Rule 16 makes clear that one of the purposes behind Rule 16(f) is "to give the court sufficient control to prevent unnecessary delay and court time consequent upon a multiplication of discovery motions." 8 Moore's, Federal Practice, ¶ 16.01[3], at 16–8 (2d ed. 1953).

■ After a careful examination of the record, we are unable to say that Newman was prejudiced by the court's denial of his request. As stated above, Nee had completed his testimony, including his cross-examination, on the previous day. The tape was not introduced into evidence and the prosecutor never listened to it (N.T. 398).[8] Moreover, the notes taken by Nee after he listened to the tape were provided to the defense for cross-examination.

Since the defendant has failed to demonstrate why the grant of his motion, which was made in the middle of the trial, would be in the interest of justice, the court properly denied it.

## III.

■ The defendant's final contention that the trial court's facetious comments made during its charge constituted plain error is also without merit. See United States v. Newman, *supra* at note 1. Although the alleged "witty diversities" may have been unwise, we cannot say that they affected the substantial rights of Newman. F.R.Crim.P. 52(a).

For the foregoing reasons, the June 22, 1972, sentence and judgment will be affirmed.

GIBBONS, Circuit Judge (dissenting).

In Giglio v. United States, 405 U.S. 150, 92 S.Ct. 765, 31 L.Ed.2d 104 (1972), the Supreme Court held that discovery, after trial, of the nondisclosure by the United States Attorney's office of an understanding between that office and a key government witness that the witness had been promised some degree of immunity, or in the Government's version "would definitely be prosecuted if he did not testify and that if he did testify he would be obliged to rely on the 'good judgment and conscience of the government' as to whether he would be prosecuted", *Id.* at 153, 92 S.Ct. at 765, was ground for the grant of a new trial. Chief Justice Burger reasoned:

> "Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prose-

---

**8.** Proof of the contents of the intercepted telephone conversations was not required to prove the charges against the defend-ant. *Cf.* United States v. Liddy, In Re Allen, 12 Crim.Law Reporter 2343 (D.C. Cir., Jan. 19, 1973).

cution would be relevant to his credibility and the jury was entitled to know of it." *Id.* at 154–155, 92 S.Ct. at 766.

Substituting in the foregoing quotation the name of the witness Thomas Nee for the name Taliento, the quotation would serve as an accurate description of Nee's role in the instant case. Nee is an accomplice. Without his testimony there would have been no case against appellant Newman. On direct examination Nee was asked, and answered:

"Q. Was there any kind of a deal that was made between you and the United States Attorney's office or the Federal Bureau of Investigation?

A. There was no so-called deals made. The only thing was said was if I would testify in this case that they would mention to the judge that I did testify for the government, which was no promise or no threat or anything.

\*　\*　\*　\*　\*　\*

Q. Do you know what your sentence is going to be?

A. I have no idea.

Q. Has anybody made any promises or representations to you?

A. No, and this is one reason I have never been able to get a job, because I can't tell people that I will be here next week, you know, or next month after the sentencing." (Tr. 140–42).

On cross-examination Nee was asked:

"Q. Did you discuss fully your illegal snooping activities with Mr. Thornburgh?" (Tr. 194).

To put the question in context, the evidence in the Government's case was that Nee, a telephone company employee, engaged in the moonlighting business of illegal wiretapping, and that the activities which resulted in the Newman indictment were a part of that broader business which included other illegal interceptions. Mr. Thornburgh is the United States Attorney. His objection to this question was sustained. Later in cross-examination Nee was asked and answered:

"Q. Did you testify on two occasions before a federal grand jury?

A. Yes.

Q. On one of those occasions, you admit here today that you did lie under oath?

A. Yes, sir." (Tr. 205).

On several occasions when Nee was cross-examined about other incidents of illegal wiretapping he refused to answer on the ground of possible self-incrimination. Throughout the cross-examination, when other illegal activities were touched upon, both the United States Attorney and the district judge took steps sua sponte to apprise the witness of his Fifth Amendment rights. Following the cross-examination the United States Attorney on redirect, in rehabilitating Nee, asked and was answered:

"Q. Mr. Nee, you have pleaded guilty to the charges of violation of the federal wiretapping law?

A. Yes, sir.

Q. And you understand that plea of guilty is just as much a guilty finding as a verdict by a jury?

A. Yes, sir.

Q. And you did that with the advice of counsel, didn't you?

A. Yes, sir." (Tr. 306–07).

On re-cross Nee was asked and answered:

"Q. Sir, you have been made no promises or no threats have been made against you concerning your testimony in this case?

A. No, sir, no threats have been made or no promises have been made.

Q. Have you had any discussion with any member of the U. S. Attorney's office concerning what information you will provide to the United States Attorney after sentence is imposed upon you?

A. I have promised them nothing.

Q. Have you made any indication to the United States Attorney's office concerning what you might do in the event that they show their good faith?

A. No, sir. I told them I would testify fully and truthfully in this case, and that is all I said I would testify. In fact, I specifically said I would never testify under the other situations.

Q. Was it then your indication to the United States Attorney's office that you would never testify against anybody except the defendant, Michael Newman?

A. No, I didn't say anybody. I said under certain situations that they were talking about. I didn't say anybody.

Q. Did you indicate a willingness after the United States Attorney's office shows their good faith to cooperate further with them?

A. No, sir. I said I would never testify in other incidents, that they would never get me on the stand." (Tr. 318–19).

The overall impression created by Nee's testimony was that the only discussion with the Government concerned his testimony in the instant case, that the Government gave him no expectation of any consideration beyond calling to the sentencing judge's attention that he had testified in this case, and that he was in all other respects uncooperative.

With that overall impression before the jury, we turn to a colloquy which took place ex parte between the United States Attorney and the court during Nee's direct examination. The United States Attorney asked to see the judge outside the presence of the deeense attorney, who consented so long as a transcript of the conference was made. That transcript discloses:

"MR. THORNBURGH: Your Honor, I am afraid through inadvertence we might have stumbled into something here that is troublesome for Mr. Nee.

He has indicated to me that he did perform jobs for other persons of this type. He has never and has steadfastly refused to tell me about them because he is in genuine fear of physical harm.

As I size him up, he is not pulling my leg, and it involves some racket connections in McKeesport, and I have tried to studiously avoid getting into that, and I am sure your Honor asked a perfectly logical question and maybe it would have been relevant in cross examination anyway, but I am a little concerned about him being forced to answer these things because he seems to express a genuine fear of bodily harm with expression of distress of any disclosure of for whom these jobs were done.

THE COURT: Well, I presume as long as you don't prosecute him for having inadvertently admitting something—

MR. THORNBURGH: Well, his problem is this: This area of McKeesport is something else again. He thinks this whole proceeding is fixed, that Newman is going to 'take a walk' automatically. That is what he tells me. *He indicated if we indicate our good faith as best we can that he will disclose these facts at that time and we will then proceed to prosecute those persons who are responsible,* but he has a Fifth Amendment right to I think avoid getting into those other offenses." (Tr. 145–46) (Emphasis Supplied).

When the transcript of the conference came to the attention of the defense counsel, he asked for a side bar conference at which he informed the court of his desire to call the United States Attorney to the stand to develop what the defense hoped would be testimony casting doubt upon Nee's testimony that his cooperation was limited to this case and his expectation of reward limited to a representation that his testimony in this case would be called to the attention of the sentencing judge. If Nee's expectation of reward was greater than he had

indicated, the possible impeaching effect would be greater. The United States Attorney responded at side bar:

"We told him we would bring his cooperation to the attention of the court at the proper time." (Tr. 642).

He objected to taking the stand. The jury was excused. A further colloquy took place in which the defense attorney expanded his argument that he desired to know the extent of Nee's anticipated cooperation and what offenses were included within any understanding with the Government. This colloquy took place:

"MR. THORNBURGH: Tom, you know full well the practice of a prosecution office when a man purges himself of perjury. You know that. We don't go around prosecuting people without giving them a chance. We can't.

MR. LIVINGSTON: Now, wait a second. I don't mean this in the sense of unethical impropriety. I mean in the sense that I think it is improper for you to make the determination that he purged himself of perjury the second time.

MR. THORNBURGH: I make every determination in our office as to who is prosecuted, and you know full well we decline a basketfull of prosecutions every week.

MR. LIVINGSTON: But what you are doing here is saying, in effect, that he has purged himself of perjury the second time.

MR. THORNBURGH: I don't know at this point, but I am not going to prosecute him at this point.

MR. LIVINGSTON: For example, if it was brought to your attention that he perjured himself the second time—

MR. THORNBURGH: We could consider it. These are matters within the discretion of the prosecutor's office, and I think this is just a grandstand play, your Honor, and I resent it very much. There is no basis in that scrap of paper for thinking a deal has been made with Mr. Nee.

MR. LIVINGSTON: I think that becomes a jury question.

MR. THORNBURGH: You're right, I said I hope we could make some more cases if this person gets rid of the idea everything is fixed in McKeesport, but the idea of—

MR. LIVINGSTON: That he will disclose those facts at that time.

MR. THORNBURGH: He indicated if we indicated—and I'm talking in terms of circles within circles here—we made no deal. I didn't say to Tom Nee, and there is absolutely no basis in that piece of paper for you making that kind of statement—" (Tr. 645–46).

The court ruled:

"I consider it to be irrelevant to this case, the hope for the future if the witness should prove more talkative in the future than he has in the past and if nobody shoots him on the way home." (Tr. 647).

This is not a case, such as United States ex rel. Dale v. Williams, 459 F.2d 763 (3d Cir. 1972), where the possible impeaching effect of any understanding with the prosecutor went to the credibility of a witness whose testimony was merely cumulative or corroborative of other unimpeached witnesses. Nor is it a case where because of latitude permitted with respect to other impeaching evidence exclusion of the evidence can be regarded as harmless error. See, e. g., United States v. Hykel, 461 F.2d 721, 727 (3d Cir. 1972); United States v. Murray, 445 F.2d 1171 (3d Cir. 1971). The effect of the district court's ruling was to require that the defendant accept the United States Attorney's interpretation of the impeaching effect of whatever discussion did take place. Nee was the Government's case, and he was effectively safeguarded from impeachment. What is perfectly clear is that the discussions between Nee and the Government went beyond the instant case, and

that the Government's undertaking was to inform the court of Nee's "cooperation". The United States Attorney never said unequivocally that the "cooperation" referred to testimony in this case only. The jury never knew these facts.

The appellant Newman, and another defendant, Gaca, who was tried separately in March of 1972, were sentenced on June 22, 1972. The witness, Nee, who had pleaded guilty on September 29, 1970, was sentenced at the same time. At the sentencing the United States Attorney appeared and addressed the court as follows:

"There is one matter which I am bound to bring to the Court's attention and which the Court is certainly aware of. That is the fact that the defendant Nee, who pleaded guilty to the charges contained in the first indictment, was, from the time that he appeared before the grand jury as a Government witness, wholly cooperative. He appeared at every appointment made with FBI agents or with persons in my office on time. He cooperated to the maximum extent, and I think it's fair to say that without his cooperation, the convictions of the two other defendants, which resulted from the indictment returned on November 17, 1970, would have been impossible. We would never have been able to determine the full extent of the activity undertaken in this case and the true complexion of the invasion of privacy carried out through electronic means without the cooperation of Mr. Nee. His cooperation extended from the time that he entered a plea of guilty in September of 1970 to this date and appeared at two trials, was subject to rigorous cross examination by skilled defense counsel and in both instances, I think it's manifest from the findings of guilty the jury accepted his testimony as true in forming a basis for the conviction of defendants Newman and Gaca.

I think it would be a gross defalcation on the part of the Government not to bring this cooperation to the Court's attention because frankly, the Government is always trying to encourage criminal defendants to cooperate with the Government in bringing others involved in criminal enterprise to the bar of justice and were we not to then stand in open court and make known to the Court the nature and extent of that cooperation, we would be defaulting, not only on the individual defendant, but on the processes of criminal justice within this Western District of Pennsylvania.

THE COURT: Elaborating a little on that, can you make any statement as to whether the defendant Nee furnished any additional information concerning other cases than the ones which he testified concerning in open court?

MR. THORNBURGH: He has not, your Honor. As he stated on the witness stand in both trials in this case, he has stated only to us that he asserts his right under the Fifth Amendment of the United States not to testify with respect to other offenses. He expresses to us a fear for his physical well-being and safety, not from these defendants but with respect to other offenses, and I have no manner or means to compel him to testify other than the grant of immunity which we are not at the present time considering due to the pending sentencing and final resolution of this case, but I recognize and I think the Court recognizes his right to refuse to testify on matters that would incriminate himself and while his cooperation has been complete and thorough in this case, we have at this point received no further information from him. That is a matter of continuing concern to us." (Tr. of Sentencing 6–8).

The *Giglio* issue apparently arose in Gaca's case as well, for at the sentencing Gaca's attorney contrasted what he referred to as a plea for leniency on behalf of Nee to the position taken at the Gaca trial that there was no understanding

with Nee. The United States Attorney responded:

"I. repeat again no promises were made to Mr. Nee with respect to any deal. I have made no plea on his behalf today. I merely think it's appropriate to bring to the Court's attention, have done so in the past and will do so in the future, that a witness has cooperated with the United States Government in securing a conviction." (Tr. of Sentencing 17).

With deference, I suggest that the majority has read ungenerously both Chief Justice Burger's opinion in Giglio v. United States, *supra*, and the compulsory process clause of the Sixth Amendment. *Giglio*, it seems to me, is based upon the assumption that the jury is entitled to hear all the facts from which a crucial witness' expectations of benefit from testimony might be inferred, and to judge for itself whether or not in the light of those facts the witness is entirely credible. The fine lines drawn by the United States Attorney here, between a representation as to the witness' cooperation and a plea on his behalf, or between a promise and an understanding, are not to be drawn by the attorney for the Government. They are to be drawn by the jury in the light of all the circumstances. And if that relevant information is in the possession of the United States Attorney the compulsory process clause requires that he testify. Thus, Part I of the majority opinion errs in two respects. First, it approaches the *Giglio* problem as if only a "deal" or "bargain" in a Willistonian sense would be impeaching. The critical inquiry is not whether the prosecutor made a contract, but what was the witness' expectation. Second, it assumes that the defense must accept the prosecutor's characterization of what took place, rather than leaving the defense free to call a witness to lay the facts before the jury. Unlike the *Hykel* and *Murray* cases, the circumstances from which the jury could decide whether Nee might have been inclined to testify falsely in favor of the Government were not adequately presented to it in this case.

Nee's credibility is also directly involved in the district court ruling discussed in Part II of the majority opinion. The telephone conversations interception which resulted in the indictment was made by means of a magnetic tape recorder connected to a telephone line by Nee. The tape recorder was introduced in evidence, but the tape remained in the possession of the police department of McKeesport, Pennsylvania, which had discovered it. Prior to his testimony Nee listened to the tape recording for the purpose of refreshing his recollection. He made notes to which he referred during his testimony. (Tr. 208–10). He also mentioned some of the contents of the tape in his testimony. (Tr. 317).

The indictment is in two counts. Count I charges unlawful interception in violation of 18 U.S.C. § 2511(1)(a). Count II charges unlawful disclosure of an intercepted communication in violation of 18 U.S.C. § 2511(1)(c). The Government attempted to establish Newman's violation of § 2511(1)(c) by testimony that his wife had discussed with third persons information which could only have come from one of the intercepted conversations. Harry Walsh, the son of a state legislator, testified that Mrs. Newman repeated to him remarks he had made over the telephone to Mr. O'Neil. (Tr. 348–59, 382). Nee testified that two conversations between O'Neil and Mr. Walsh were on the tape. At the end of the Government's case the district court granted a motion for judgment of acquittal on the second count. Thus, to some extent the credibility of Nee's testimony as to the contents of the intercepted communications became less critical than it would have been had the second count remained in the case. Nevertheless, the jury had heard Nee's testimony about the contents of the tape, and on Count I his testimony was the Government's case. His credibility was the central issue of the case. If the defense could have established that he colored his discussion of the intercepted communications so as to reenforce

Walsh's testimony and thus the Government's theory of proof on Count II, the impeaching effect would remain whether or not that count remained in the case.

At the end of the Government's case the defense attorney made a motion for an opportunity to listen to the tape recording so as to determine if it would have such an impeaching effect.[1] In denying the motion the court said:

> "I really think it is theoretically irrelevant and probably no harm will result, so the motion is denied." (Tr. 402).

The Government advances two theories in defense of this ruling. First, it suggests that permitting the defense attorney to listen to the tape recording would itself be a violation of 18 U.S.C. § 2511. Second, it urges that the motion was untimely.

The first contention is discussed in United States v. Liddy, In re Allen, No. 73–1020 (D.C.Cir. Jan. 19, 1973), which revises a district court order permitting disclosure of the contents of the communication in a prosecution for violation of 18 U.S.C. § 2511. We need not reach the same issues here, because in this case, correctly or incorrectly, the contents of some of the intercepted communications were in fact disclosed to the jury during the Government's case. Moreover, the Government, prior to the trial, arranged to have such of the communications as were still preserved on the tape recording disclosed to its key witness, Nee. Elementary due process requires that if disclosure has been permitted in a prosecution under 18 U.S.C. § 2511 the defense be afforded an opportunity to verify that the disclosure being made is a truthful account of the communication. In any event, the United States Attorney did not rely upon 18 U.S.C. § 2511 in objecting to the defendant's motion, and the district court's ruling was made not on that ground but on the ground of relevancy.

The second theory, that of untimeliness, is accepted by the majority. No objection was made by the Government to the timeliness of the motion. There is no indication whatsoever in the record that the trial would in any way have been delayed by the grant of the motion. The district judge did not deny the motion on the ground of untimeliness. The suggestion that the motion for discovery of the tape recording should have been made prior to the trial was not advanced below or considered by the district court for the obvious reason that until Nee testified to the contents of the tape and to having prepared for trial by listening to the tape recording there was no way in which the tape recording would have been relevant to the defense. Undoubtedly, had a motion for leave to listen to the tape been made prior to the trial the court would have ruled that further disclosure of the private conversations preserved thereon was premature and might prove to be unnecessary. The motion was made at the time when it became appropriate; that is, at the end of the Government's case and before the beginning of the defendant's case. If the

---

1. He said in making this motion:

> "If your Honor please, I think this is one of the prime examples of why counsel rather than the court should be in a position of making the determination as to what would be helpful. Now, I talked in terms of exculpatory evidence, but not exculpatory alone. For example—and not limiting my request to this particular matter—here is a witness that testified concerning the conversation which we don't know was intercepted or not, the witness Walsh, who by his testimony suggests as the conversation came back to him, it therefore must have been on that tape and that tape must have come into the possession of somebody who got it to his secretary directly or indirectly. Now, I think it critical if that conversation does not appear on the tape at all. I think Mr. Newman has a right to know that.
>
> &ast; &ast; &ast; &ast; &ast;
>
> Obviously Mr. Thornburgh places a great deal more credence on the testimony of Mr. Nee than I do.
>
> &ast; &ast; &ast; &ast; &ast;
>
> Now, it is my position that this witness [Nee] may be telling the truth and may not be telling the truth, but I as a lawyer am not going to rely on his representation of what is on that tape . . . ." (Tr. 399–400).

tape were to prove to be impeaching its introduction in evidence would occur not during the Government's case but during the defense case, which is the only time when in a properly tried case the defense introduces exhibits in evidence.

The majority opinion holds that we can affirm because, after a careful examination of the record, we cannot say that Newman was prejudiced by the ruling. The fallacy in that ruling is that we simply do not know whether or not Newman was prejudiced since we do not know whether the tape recording would have been impeaching. The district judge didn't hear it. The United States Attorney didn't hear it. The defense attorney didn't hear it. The judges in the majority didn't hear it. Only the witness Nee heard it, and almost the sole issue in the case was Nee's credibility.

The effect of Part I of the majority opinion is that the defendant must be satisfied with the United States Attorney's appraisal of the witness' credibility. The effect of Part II is that the defendant must rely on Nee's appraisal of his own credibility. The defendant was entitled to have the jury make the appraisal. I would reverse and remand for a new trial.