**UNITED STATES of America**

v.

**Noah Carl McNAIR.**

**Cr. No. 77–179.**

United States District Court,
E. D. Pennsylvania.

Aug. 11, 1977.

104

Luther E. Weaver and Bruce J. Chasan, Asst. U. S. Attys., Philadelphia, Pa., for plaintiff.

Brian R. Williams, Philadelphia, Pa., for defendant.

1. Defendant's remaining arguments do not merit discussion.

OPINION

DITTER, District Judge.

The defendant was convicted of bank robbery. In his post trial motions, he alleges that surveillance photographs of the robbery were not properly authenticated, prejudicial identification procedures were followed, he was improperly denied a suppression hearing, and members of the jury may have known of a prior conviction. I conclude that there were no trial or pre-trial errors and that defendant's motions must be denied.[1]

On March 23, 1977, a branch office of the Philadelphia National Bank was robbed by a Negro male who presented a note demanding money to a teller, Mrs. Mary Ann Morell. Also present in the bank were Miss Sheri Webster, the teller whose window was next to that of Mrs. Morell, and Roy M. Freas, Jr., the bank manager. As soon as Mrs. Morell handed him the money, the bank robber ordered her to turn around, facing away from him. She did so and he left the bank. However, while taking the bills from the drawer in which they were kept, Mrs. Morell had caused a bank surveillance camera to be activated.

The next day, having the pictures from this camera, Mrs. Morell and Miss Webster were individually shown photographs of approximately 800 suspects but did not identify the robber as being among the group. Two weeks later, April 7, 1977, this time in a conference room at the bank, they were once again separately shown the surveillance photograph[2] and then presented with an array of eight sets of photographs of Negro males. Both Mrs. Morell and Miss Webster, as well as Mr. Freas, selected a picture of the defendant as being that of the individual who had robbed the bank. During the trial, all three witnesses identified the defendant as being the robber, related the circumstances under which they had identified his picture, and authenticated numerous bank surveillance photographs which were then received in evidence.

2. Prior to April 7, 1977, Mrs. Morell and Miss Webster also observed this photograph on at least one occasion when it appeared in a local newspaper.

■ Defendant's first contention is that a proper foundation was not laid for the introduction of the surveillance photographs. Specifically, he argues that the tellers could not testify the photographs were an accurate representation of the scene depicted where they were not facing the camera or not in line with the camera angle, and that "expert" witnesses familiar with the installation and maintenance of the camera should have been called. The Federal Rules of Evidence, No. 901, provide, however, that the requirement for authentication may be satisfied by testimony of a witness with knowledge that a photograph is what it is claimed to be. See also *United States v. Hobbs*, 403 F.2d 977, 978–79 (6th Cir. 1968).

Mrs. Morell and Miss Webster both testified that these photographs were accurate representations of the robbery scene and participants. Mrs. Morell identified her teller's station, herself, the drive-in window and teller behind her, and the robber. The defendant's argument that she could not say the pictures were accurate because her back is turned in some of them is fatuous. Miss Webster testified she and her station, a customer on whom she was waiting, the drive-in teller, Mrs. Morell, and the man who robbed the bank were all shown in the various photographs.

I am satisfied the bank surveillance photographs were sufficiently authenticated.

■ Defendant next asserts the identification process was tainted because Mrs. Morell and Miss Webster were shown one of the bank surveillance pictures taken while the robbery was in process before they saw the spread which included defendant's photograph. This procedure, however, was specifically approved in *United States v. Irby*, 517 F.2d 506, 507 (4th Cir. 1975), *cert. denied, sub nom. Smith v. U. S.*, 424 U.S. 973, 96 S.Ct. 1475, 47 L.Ed.2d 742 (1976) where it is said,

The showing of photographs taken during the course of the bank robbery to witnesses prior to their selecting photographs of defendants Irby and Smith from a photographic lineup was not unduly suggestive since it is not disputed that the first set of photographs accurately depicted the robbery as it occurred. Use of the first set of photographs in this manner served the useful purpose of refreshing the recollection of the witnesses to the end that their subsequent identification from the photographic lineup and an in-court identification of one defendant by one witness were rendered more accurate. Nor were the photographs used in the photographic lineup' unduly suggestive.

The Supreme Court has not criticized the showing of photographs per se to potential identification witnesses, but only those which might lead to misidentification.[3] As the Court recently said in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), one who is challenging identification procedures must establish that, under the totality of the circumstances, "the confrontation conducted was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1968). In this regard, "reliability is the linchpin in determining the admissibility of identification testimony" and those factors set out in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), are the ones to be considered in determining reliability. *Manson v. Brathwaite,* supra, 432 U.S. at 114, 97 S.Ct. at 2252.

When these standards are applied, defendant's contention must fail. In the first place, the witnesses had ample opportunity to view the robber at the time of the crime. Mrs. Morell was no more than a foot or two away and looked at him, albeit not continu-

---

**3.** ". . . [C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

ously, for a period of 90 seconds. Miss Webster, who occupied the teller's window adjacent to that of Mrs. Morell, was approximately three to four feet away and watched the robber for about one minute. Mr. Freas, who was approximately 30 or 40 feet away from Mrs. Morell's window, observed the robber for 20 seconds. The robbery took place on a bright, clear morning in a well-lighted bank. The robber wore no mask, and although he donned a hat and sunglasses, neither hid his facial features. Secondly, I find that the witnesses paid sufficient attention to the matter at hand. Mrs. Morell and Miss Webster were experienced tellers, and they testified that they attempted to observe the robber for as long as they could without appearing to stare at him. Mr. Freas also looked closely at the robber although his testimony must be accorded a lesser degree of importance because of the much greater distance between him and the robber and his shorter period of observation. Thirdly, there was no prior misidentification. Both Mrs. Morell and Miss Webster had seen 800 photographs the day after the robbery and made no identification, yet they quickly picked out the defendant's photograph two weeks later. Fourth, notwithstanding vigorous and searching cross-examination, none of the witnesses displayed any doubt about their respective identification of the defendant. In addition, there was nothing suggestive about the photo spread presented to the witnesses on April 7, 1977. Each of the eight photographs showed a Negro male in his 20's or 30's who, like the defendant, had no facial hair or scars. The three witnesses viewed these photographs individually, along with the FBI case agent, and made their identification from their own views and recollections and not from conversa-

tions with each other. The FBI agent said nothing to suggest which person in the pictures was under suspicion and made no comment when the defendant's picture was selected.

■ At oral argument defendant asserted that if he was in custody when the bank personnel were looking at the photographs, he was entitled to have counsel present in order to insure that the spread was not suggestive. The short answer to this is that the Supreme Court and the Third Circuit have extensively examined this argument and specifically ruled that a pretrial photographic identification is not a critical stage to which the right to counsel attaches. *United States v. Ash*, 413 U.S. 300, 317, 93 S.Ct. 2568, 2577–2579, 37 L.Ed.2d 619 (1973); *United States ex rel. Reed v. Anderson*, 461 F.2d 739, 745 (3d Cir. 1972).[4]

Taken together, all these circumstances indicate there was little chance that the procedures here would lead to misidentification. The use of the bank surveillance photograph, if anything, led to accuracy and supports the conclusion that there was no violation of defendant's due process rights.

■ Defendant's next argument is that it was error to refuse his motion to suppress without affording him a hearing. Mr. McNair's application was concerned with events that took place when he was arrested in Baltimore, Maryland, on March 28, 1977. On that day, McNair had gone to a jewelry store and was negotiating the purchase of a watch. He proffered the clerk certain dye-stained currency which attracted the attention of a policeman who was also in the store. As a result, McNair was taken to police headquarters where among other things there was taken from his possession a pair of sunglasses and a Philadel-

---

4. Prior to the en banc decision in *Anderson*, the circuit court had held that a photo spread, if defendant was in custody, was a critical stage of the proceeding and the accused was entitled to have counsel present to guard against suggestiveness. *United States v. Zeiler*, 427 F.2d 1305 (3d Cir. 1970) (*Zeiler* I). Following remand and subsequent appeal, the court once again considered photo spreads and concluded that in-court identifications would be admissi-

ble only if the government established an origin independent of a photo spread conducted outside the presence of counsel. *United States v. Zeiler*, 447 F.2d 993 (3d Cir. 1971) (*Zeiler* II).

Of course, if the spread was inherently suggestive, the defendant should be protected against it, *Anderson*, supra, 461 F.2d at 745, but, I made a specific finding that here there was nothing suggestive about the photo array utilized in this case.

phia-Baltimore-Philadelphia railroad ticket. He also made a possibly incriminating statement.

McNair was subsequently indicted for two Philadelphia bank robberies, No. 77–179, the instant matter, and No. 77–149, which was assigned to my colleague, the Honorable Alfred L. Luongo. Asserting the seizure of items from his person was invalid because there had been no probable cause to arrest and that the statement to the police was infirm because no *Miranda* warnings had been given, defendant filed identical motions to suppress in both cases.

Prior to the scheduling of a hearing on the motion before Judge Luongo, defendant's counsel was informed that I believed that the issues raised in the two applications were the same and that any ruling on the issues raised in defendant's application to Judge Luongo would be binding insofar as those issues also related to the instant case. Nevertheless, defendant's counsel was also informed that if he so wished, I would sit with Judge Luongo, hear the evidence, make my own findings of fact, draw my own conclusions of law, and rule on the motion. No response to this offer was ever received. Subsequently, Judge Luongo granted the motion to suppress as to defendant's oral statements made at the Baltimore police station, but denied it in all other respects. By order dated June 2, 1977, I followed Judge Luongo's ruling and dismissed defendant's motion. Defendant now contends that I should have heard his motion to suppress the physical evidence, a contention I must reject.

The doctrine of collateral estoppel[5] precludes the relitigation of issues actually decided in former judicial proceedings. It is commonly recognized that three requirements must be satisfied before collateral estoppel applies:

a) the issue decided in the prior litigation must be identical with the issue presented in the action in question;

b) the prior litigation must have resulted in a final judgment on the merits; and

c) the party against whom the estoppel is asserted must have been a party, or in privity with a party, to the prior adjudication. *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 844 (3d Cir. 1974).

Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law for at least 50 years. *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970).

A variety of situations illustrate the principle. In *United States v. Newman*, 490 F.2d 139 (3d Cir. 1974), Gaca and Newman were indicted for the same offense. The cases against them were severed and Newman proceeded to trial first. He was found guilty and his conviction was affirmed. One of the issues passed upon by the Court of Appeals was Newman's assertion that he should have been allowed to call the U.S. Attorney as a witness in order to elicit evidence as to a bargain between the government and one Nee, who had testified against Newman. The Court of Appeals affirmed the District Court's refusal to allow this testimony. When Gaca came to trial, a similar request was made on his behalf and was also refused by the District Court.

Citing its prior decision which dealt with Newman's contention, *United States v. Newman*, 476 F.2d 733, 737 (3d Cir. 1973), the Court said,

The above case is not only controlling on the standard to be applied, but is also determinative of the outcome with regard to this portion of Gaca's appeal. Gaca asserts that statements brought to the attention of the trial judge in *Newman* indicate that the government may have bargained with Nee. These were the very statements considered by this Court in *Newman*. If this Court felt that it was reasonable for the district judge to disbelieve that the U.S. Attorney had vital information in *Newman* the same conclusion must apply herein, inasmuch as

---

**5.** For the difference between collateral estoppel and res judicata see *Murphy v. Landsburg*, 490

F.2d 319, 322 (3d Cir. 1973), cert. denied 416 U.S. 939, 94 S.Ct. 1941, 40 L.Ed.2d 289 (1974).

we are reviewing the same precise statement.

Thus, this Court is bound by precedent to find that the mere refusal to compel testimony by the U.S. Attorney did not constitute error. 490 F.2d at 146.

In *United States v. Taylor*, 437 F.2d 371 (4th Cir. 1971), at the request of counsel, defendant was examined to determine whether he was competent to stand trial. He was found to be competent and the district judge accepted the report. However, a mistrial was declared when the defendant attacked a witness. Thereafter, the defendant was called for trial before a different judge and again there was a motion questioning competency.

In determining that there had been no error in refusing to consider this motion,[6] the court said:

There was no need for a subsequent examination of the defendant's competence to stand trial. The second motion recited essentially the same facts as its predecessor; only a contention that the first examination was deficient was added. Where an examination has been conducted so recently as to furnish a basis for a determination of present competence, there is ordinarily no reason to order another. *Id.* at 376.

*Hernandez-Uribe v. United States*, 515 F.2d 20 (8th Cir. 1975), cert. denied 423 U.S. 1057, 96 S.Ct. 791, 46 L.Ed.2d 647 (1976), involved an alien who had previously been convicted for unlawfully entering the United States. Subsequently he was charged with unlawful re-entry and was again convicted. During his latter trial, the defendant testified that he had been born in Texas. Nonetheless, the district judge instructed the jury that the defendant's prior conviction foreclosed consideration of that question. Since he had presented no evidence to show a change in his status as an alien between his first and second trials, the

district judge refused to submit the issue of citizenship to the jury.

The Court of Appeals stated:

We think the instant case is particularly appropriate for the application of the doctrine of collateral estoppel. The record shows that defendant had evidence of his claimed Texas birth *prior* to his guilty plea in the 1967 criminal prosecution. The evidence of his Mexican birth is strong. Defendant did have an opportunity to contest the Government's determination of alienage in that case on the same basis as alleged here. He there had a right to a jury trial in which he could have presented any evidence he had pertaining to the place of his birth. By his plea of guilty, defendant waived those constitutional rights here challenged which are guaranteed every criminal defendant. *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1970); *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). Defendant has made no challenge to the validity of his guilty plea to the 1967 charge. He has made no claim that his status as an alien has changed since 1967. Under such circumstances, we see no violation of any constitutional right of the defendant in collaterally estopping him from denying his alien status. *Id.* at 22.

One of the requirements for the applicability of collateral estoppel is final judgment in the prior proceeding. At the time McNair was tried before me, he had been convicted before Judge Luongo but had not been sentenced. Thus, there was no final judgment in Judge Luongo's case. If it was error on my part to accept Judge Luongo's findings in the absence of a final judgment the error is now harmless since in the meantime McNair has been sentenced by Judge Luongo. More importantly, in *Ashe*, supra, 397 U.S. 444, 90 S.Ct. 1194, the Supreme Court commented that the rule of collateral estoppel in criminal cases is not to

---

**6.** I recognize that one of the requirements for collateral estoppel, final judgment, was not present in *Taylor.* Moreover, a defendant may be competent today and not tomorrow. I cite *Taylor*, however, to show that a pretrial matter once considered need not be reconsidered each time a defendant is called for trial.

be applied with the hyper-technical and archaic approach of a 19th Century pleading book, but with realism and rationality. The inquiry must be set in a practical frame and viewed with an eye to all circumstances of the proceeding, since any other test would simply amount to a rejection of the rule of collateral estoppel in criminal proceedings. Realistically speaking, McNair's pretrial contentions had been finally determined by Judge Luongo prior to the time I ruled on the motion. Obviously, if Judge Luongo was in error, McNair will be entitled to a new trial in the instant case.

Finally, I conclude that McNair's failure to respond to my offer to sit with Judge Luongo but make my own findings and reach my own conclusions amounts to a waiver of whatever rights he may have had in that regard.

▮ Defendant's final argument involved a somewhat unusual set of circumstances which came to light as voir dire began. Defendant's first trial started May 25, 1977, and the jury returned its verdict on May 26. In order to avoid possible prejudice to the defendant, his trial in the instant case was delayed until Tuesday, June 7, 1977, when, under normal conditions, no jurors would be present who had been present during the time of his first trial. However, upon the jurors' reporting to the court room for voir dire, counsel recognized one of them as having been on the panel from which McNair's jury in Judge Luongo's trial had been selected. It was then discovered that several persons who had served during the prior two-week period had been retained for further jury duty, although none of those then in the court room had been on McNair's jury. Upon being alerted to these facts, I excused from the panel all those who had served during the time of McNair's first trial and they were replaced by new veniremen. I admonished the jurors who were excused that they were to have no conversations concerning this matter with anyone. When the new panel was assembled a short time later, I questioned the jurors to see if any had ever seen or heard of the defendant or his counsel. So that the panel would not know that my particular interest was in their knowledge of McNair, I asked similar questions about the deputy clerk, court reporter, the assistant United States Attorney, U.S. Marshal, and me. None of the veniremen had ever seen or heard of any of us.

Defendant now argues that I erred in refusing to grant a continuance because there was a possibility that the jury selected in this case knew of his previous conviction. How this knowledge might have come to any of them is not suggested— much less supported by evidence—and I too am hard pressed to see any but the most remote risk that such prejudice might have occurred. Possibly, of course, a juror in Judge Luongo's trial might have told one of the persons who thereafter became a venireman in my case but who was excused before voir dire really began that the defendant's name in a conviction returned on May 26 was McNair; that on June 7, this person might have told one of the "new" veniremen of the name McNair; that the venireman would remember what he had been told and connect it to this defendant; that the venireman did not divulge his knowledge in response to my questioning, and that he was one of the jurors selected to try the case.

I reject the notion that a new trial should be awarded on the basis of such an obscure possibility. In addition, to accept defendant's contention would throw into doubt the validity of all voir dire questioning, the truthfulness of the answers given, and the sincerity of all those called to serve on our juries. In the absence of something more than mere speculation, I refuse to do so.